H. P. BANKER v. JAMES MCLAUGHLIN.

No. A-1272. Decided February 4, 1948.
Rehearing overruled March 17, 1948.
(208 S. W., 2d Series, 843.)

*Smith, Smith & Levy* and *Carl D. Levy,* all of Beaumont,

*A. H. Boyd,* of Rusk, *Homer E. Stephenson,* of Orange, and *Gil K. Phares,* of Port Arthur, for petitioner.

*Cecil & Keith, Lamar Cecil* and *John P. Blair,* all of Beaumont, for respondent.

Mr. Justice Taylor delivered the opinion of the Court.

James McLaughlin brought this suit against H. F. Banker to recover damages for the death of his minor son (five years and ten months old). The trial court awarded judgment in plaintiff's favor on the jury's verdict for $15,200.00. The Court of Civil Appeals, under the view that the award was excessive, caused a remittitur to be filed which reduced the judgment to $6,000.00. 200 S. W. (2d) 699. The case is here on Mr. Banker's application for the writ.

The child met his death on June 19, 1945, by drowning in a large hole, or pit, of water on Forest Park Subdivision, a homesite addition which Mr. Banker, the owner, at that time and since, was in the process of developing and marketing, his agent, C. O. Dumb assisting him in selling the homesites "to the general public." The subdivision is a 60-acre tract of land located a few miles from the city of Orange, platted into an addition of small homesites.

Plaintiff brought the suit, alleging the ownership of the subdivision by Mr. Banker, the digging of the hole by the owner which, as plaintiff alleged, made the spot (when the hole filled with water) especially attractive to children, *and dangerous;* and that *it attracted to it the child,* James McLaughlin, Jr. He alleged the owner's negeligence in creating on his premises

(without warning devices or protective measures of any character) such dangerous condition where he knew or should have known that children played.

The owner answered by general denial, and further by special answer *that the child was neither a licensee nor an invitee but was a trespasser,* and that the drowning was an accident occasioned by no fault of his. Defendant also alleged contributory negligence on the part of both the father and the child. The more specific defensive allegations were to the effect that the pool of water was not different from any other, and held no hidden danger; that the child was negligent in entering it, "the water in itself being sufficient notice to him not to enter"; that the child was negligent in that he had been warned by other children that he was too small to swim there"; that the father "was negligent in allowing his child of that age to wander about the neighborhood unattended" and "in not keeping the child at home"; and "in not keeping the child away from the pool of water; and "in not warning the child of the dangers * * *."

The trial court submitted to the jury twenty special issues all of which were answered in plaintiff's favor. The pertinent findings were to the effect that the premises (while especially attractive to children) were *dangerous* to children, such as James McLaughlin, Jr.; that children of tender years, as defendant knew or should have known, played about and swam in the pit; *that defendant was negligent* in failing to inclose it prior to June 19, 1945, and in failing to fill it up, or drain it, within a reasonable time; *and that these acts of negligence were proximate causes, respectively, of the child's death; and that plaintiff was not guilty of contributory negeligence in not keeping the child away from the pool.*

Petitioner's basic contention throughout was, as aptly expressed in Mr. Banker's second amended answer to plaintiff's petition:

"* * * that plaintiff's son was neither a licensee nor an invitee but that he was a trespasser, and that the defendant would be indebted to plaintiff only for damages wilfully or intentionally caused * * *." The points of error under which he urges this contention in his application for the writ are that the Court of Civil Appeals erred (1) in holding that the evidence raised any issue of liability on the part of petitioner; (2) in holding that the verdict of the jury was sustained by the

evidence; (3) in holding that the trial court did not err in overruling petitioner's motion for judgment non obstante; (4) that the court erred in stating in its opinion that the conditions surrounding the hole were such as to make it unusually attractive to small children and did attract James McLaughlin, Jr., and cause his death; (5) in stating that the owner permitted an unguarded, unused and abandoned pit of water, deep and dangerous, in no manner useful to him, to remain on his premises in the midst of a group of families which contained many small children; (6) in stating that the matter of inclosing or draining or filling the hole would have been accomplished with small trouble or expense without impairment of the use of the property by the owner; and (7) that children were accustomed to playing about this hole, and (8) that it was not used for any purpose.

The contentions made under the foregoing points [all except (1) and (3)] merely weigh in the scales of preponderance the testimony adduced by petitioner against that adduced by respondent. Also, the contentions, as stated, fail to accord (as they should) to the testimony adduced by respondent the more favorable consideration, and fail to recognize that the findings are in accord with a judgment in respondent's favor. The contentions, to obviate unnecessary repetition, will be considered jointly and the following all-inclusive excerpt from the opinion of the Court of Civil Appeals, together with additional items of evidence set out below, will suffice as a basis for such consideration:

"According to the evidence and finding of the jury, the appellant permitted an unguarded and unusued and abandoned pit of water, deep and dangerous, in no manner useful to him or to any one else, to remain on his premises in the midst of a group of families which contained many small children. The conditions and surroundings of the pit were such as to make it unusually attractive to small children for use as a swimming hole and did actually attract James McLaughlin, Jr., and caused his death. *The matter of enclosing or draining or filling such pit could have been accomplished with small trouble or expense without any impairment of the use of the property on the part of the appellant.*" (Emphasis ours).

At the time the child was drowned about 50 families (40 of which had small children) were living in Forest Park Subdivision; and numerous children were living in contiguous group settlements. In response to plaintiff's written request Mr. Bank-

er filed, in addition to admission of ownership and that the child was drowned June 19, 1945, in the pit or hole, the following admissions:

"Defendant * * * does admit that prior to June 19, 1945, some people had bought lots in this subdivision, none of which were located *in the immediate vicinity of the pool of water* * * *; but does not admit * * * the depth of the water; because it was unknown to the defendant as to the exact depth of the pool at that time. * * * That no warning sign or devices were placed in or near such pit or hole to warn persons of its presence. That H. F. Banker *took no precautions whatsoever to prevent children of immature years from playing about or swimming in said pit or hole.* That H. F. Banker's business in connection with the Forest Park Subdivision was to sell lots and homesites therein and in connection therewith *he encouraged and invited members of the public to come upon said premises and inspect the same with the view of selling said members of the public residential sites and lots in said subdivision.*" (Emphasis and noted omissions ours).

Under the plan of marketing, the lots (mostly with 50 ft. frontage) were being sold in pairs as homesites. The plat of the addition in evidence does not designate the extent of development at the time of the child's death, nor all of the homes in the addition where the families were living at that time. It does show that the addition contained 125 small homesites on the 60 acres, without any reservation for park or other recreational purposes. Mr. Banker testified that his plan was to subdivide this tract into homesites and sell them to the general public; and "to build streets or roads" on it, which he did "prior to June 19, 1945 * * * and since also"; and his "best estimate" was that at that time "everything was sold that faced on "the old Ferry Road" (about 2000 feet in length along the west side of his addition); that the closest house to the pool he had sold up to the time of the trial was "about 150 or 200 feet." The pool is located on the east side of Lot 10 of Block 7. Mr. McLaughlin's home (about 200 yards distant) is west of the pit on the back of Lots 15 and 16, Block 1, a small two-room house, the second purchased after Mr. Banker began marketing the homesites. The general surroundings about the pool from the standpoint of the record are described by the following bits of testimony of witnesses who saw them: As indicated by the name (Forest Park) the addition was a wooded area. One could "get to it (the pool) without any trouble"; about the pit "there was quite a bit * * * vegetation, and quite a bit of grass"; that

there was a truck "road or trail" out there; people went "back in there to have picnics"; it was "open" there, "all except some small bushes and grass"; about "the scene of this pit" there were "small bushes, where the trucks ran over them and beat them down"; there were "no trees" right at the hole or "around it"; in the "spring and summer" there would be "wild flowers and things like that growing there." Defendant himself testified that the pool was accessible to those located where plaintiff was "if they wanted to wade through grass and weeds and brush."

The waterhole itself is designated on the plat. The bank "down to the water * * * was staight off, then it had a sharp incline to the bottom"; the bank "was pretty slanting, and whenever I stepped off in there I slid on to the bottom; it (the water) came up to my chin"; the water was "well over the head of a child five or six years old"; when I (one of the searchers for the child) "got there it (the pool) was full of water"; were no outlets to it," however; "the banks were a straight off drop."

The utility of the pool to the owner was negligible after he ceased excavating there for dirt for street grading purposes. His testimony was that the pool was of "no further use" except that "it remained there for the future"; that it would be there as a reservoir for persons "who might purchase the adjoining land"; that it had never "been used for irrigation"; that "I had nothing to irrigate." He had no cattle or other stock to water there. When asked if he "wanted it for water at the time he built it" his reply was,—"I never had occasion to use it"; and that he "let it remain full of water (that period was "eight or nine months").

Mr. Banker's own testimony indicates also that the expense necessary to be incurred, if any, to eliminate the danger would have been small, if not trivial. As indicated by his filed admissions, he did not endeavor to eliminate the dangerous condition he had created; nor did he erect any warning devices, or any "keep out" signs at the pool, or any "keep off" signs on the premises in its immediate vicinity. He testified that there was a "drain ditch on the property" close by. When asked about the course of this ditch through the block on which the pool was located, on the east edge of the block, he replied: "It goes right near by, so that a person by manuvering a few shovels full of dirt can drain off the surplus water, or by blocking it, can hold it." The drain ditch was there, he said, on June 19, 1945, the date of the drowning.

While there was substantial proof of the inherent attractiveness of the place we, under our view of the case as properly one of negligence, *are concerned primarily with the dangerous condition created by petitioner on his open premises* and the fact that the dangerous features of the condition could have been eliminated at small expense without interfering with the owner's marketing of the homesites. The element of attraction is important only in so far as it may mean that the presence of children was to be anticipated.

The excavation was from 5 to 8 feet deep *"at the very shallowest place."* (Emphasis ours). It appears that soon after its use as a dirt supply had been discontinued it filled up with water so that its depth would not be ascertained by children unless (contrary to the nature of children) they are of such mature years and experience that they would measure the depth (as the average adult who could not swim would do) before entering the water.

The jury found not only that the pit, or pool, was attractive to children, but that *it was dangerous,* and *did attract* to it the McLaughlin child. It was found in answer to one special issue that the pit was *unusually attractive* and in answer to a separate issue that it was *dangerous* to children. That it was dangerous to children is not open to question under the record. Plaintiff so alleged; the jury so found, and the evidence to that effect is indisputably substantial.

The following features of the facts and circumstances of the case are determinative of the correctness of the action of the Court of Civil Appeals in affirming the trial court's judgment: (a) the place where the condition was maintained was one upon which the possessor knew or should have known that small children would likely frequent the place and play about it; (b) the condition was one of which the possessor knew, or should have known, involved an unreasonable risk of death or serious bodily harm to such children; (c) the child, because of its tender years, did not realize the risk involved in going into the pool; and (d) the utility, if any, to Mr. Banker of eliminating the danger was slight as compared to the probability of injury resulting therefrom. See in this connection, Restatement, Torts, Sec. 339 and 36 A. L. R. p. 294.

■ We agree with the judgment of the Court of Civil Appeals affirming that of the trial court, and overrule all of the above points. Flippen-Prather Realty Co. v. Mather, 207 S. W. 121;

442

Little v. James McCord Co., 151. S. W. 835; Bustillos v. South-western Portland Cement Co. (Com. App.) ,211 S. W. 929; McCoy v. Texas Power & L. Co., 239 S. W. 1105, reversing Id., 229 S. W. 623; Galveston-Houston Elec. Ry. Co. v. Reinle, 113 Texas 456, 258 S. W. 803; Houston E. & W. T. R. Co. v. Jones, 1 S. W. (2d) 743, (dr. ref.) ; Duron v. Beaumont Iron Works, 7 S. W. (2d) 867; Johns v. Ft. Worth P. & L. Co., 30 S. W. (2d) 549; West Tex. Utilities Co. v. Renner, 32 S. W. (2d) 264; Texas Pub. Service Co. v. Armstrong (wr. ref.), 37 S. W. (2d) 294; West Texas Utilities Co. v. Renner (Com. App.), 53 S. W. (2d) 451; Quisenberry v. Gulf Prod. Co., 63 S. W. (2d) 248; Tex.-La. Power Co. v. Bihl (Com. App.), 66 S. W. (2d) 672; Renfro Drug Co. v. Jackson, 81 S. W. (2d) 101, loc. cit. (5,6), p. 103; Gulf Prod. Co. v. Quisenberry (Com. App.), 128 Texas 347, 97 S. W. (2d) 166; Kellum v. Wheeler (Com. App.), 129 Texas 74, 101 S. W. (2d) 225, loc. cit. (1, 2) p. 229; Fruge v. James, 115 S. W. (2d) 1175, loc. cit. (6, 7), 1177; Texaco Country Club v. Wade, 163 S. W. (2d) 219; Best v. District of Columbia, 291 U. S. 411, 54 Sup. Ct. 487, 78 L. Ed. 882; "Liability Arising from Dangerous Premises" (1923), 1 Texas Law Review, p. 1, serially continued, Id. pp. 289 to 406; "Landowner v. Intruder, Intruder v. Landowner,—Basis of Responsibility in "Tort" (1923), 57 Amer. Law Review, pp. 321-51 (reprinted from Michigan Law Review by permission).

The Supreme Court of this State took early recognition that the so-called "attractive-nuisance doctrine" had its origin in the turntable cases; and that when children of tender years came upon the premises by virtue of their unusual attractiveness, the legal effect was that of an implied invitation to do so. Such child was regarded, not as a trespasser, but as being rightfully on the premises. We quote from the Duron (7 S. W. (2d) 869) case as follows:

"The theory of liability under the attractive nuisance doctrine is that, where the owner maintains a device or machinery on his premises of such an unusually attractive nature as to be especially alluring to children of tender years, *he thereby impliedly invites such children to come upon his premises, and, by reason of such invitation, they are relieved* from being classed as trespassers, but are in the attitude *of being rightfully on the premises.* Under such circumstances, the law placed upon the owner of such machinery or device the *duty of exercising ordinary care* to keep such machinery in reasonably safe condition for their protection, if the *facts are such as to raise the issue that the owner knew, or in the exercise of ordinary care*

*ought to have known, that such* children were likely or would probably be attracted by the machinery, and thus be drawn to the premises by such attraction." (Emphasis ours).

The "attractive-nuisance," or so called turntable doctrine, is applicable to cases involving different dangerous instrumentalities and conditions on the premises. See in this connection the McCoy case; the Duron case; San Antonio & A. P. Ry. Co. v. Morgan, 92 Texas 98, 46 S. W. 28; Stanford Oil Mill v. Barnes, 103 Texas 409, 413, 128 S. W. 375, 31 L. R. A. N. S. 1218, Ann. Cas. 1913a, 111; the Flippen-Prather case; and the McCord case.

■ In the Bustillos case the following rule was applied and quoted by the Supreme Court (opinion on certified question) in Galveston-Houston Elec. Ry. Co. v. Reinle (113 Texas 456, 258 S. W. 804) :

"The owner or occupant of real property is under no obligation to make it safe for the benefit of trespassers, intruders, or mere licensees coming upon it *without his invitation, expressed or implied. If, however, such owner or occupant invites the public or particular members of it to come upon his premises,* he owes to such persons the duty to have same in a reasonably safe condition and to give warning of latent or concealed perils." (Emphasis ours).

An important decision in the history of the holdings of this Court on the subject under discussion was made in Gulf Production Co. v. Quisenberry, supra. The suit was by the father (Quisenberry) on behalf of his minor son for damages sustained while playing upon a tubing rack teetering on its frame (with a tubing spoon at one end of the frame convenient for climbing on the rack) whereby a situation dangerous to children was created on the company's premises. The defendant company knew, as pointed out in the opinion, that "children played over the company's entire property so far as fencing or segregation is concerned," and that the company must have anticipated the presence of children there; and, knowing of conditions likely to cause injuries to persons coming on the premises, "was bound to use the care of an ordinarily prudent person" to prevent such injuries. The holding stated governed this Court's decision in the case and was announced on the theory, as stated in the opinion, that "the basis for recovery must be the company's negligence." It was pointed out in the Quisenberry case preliminary to giving application to this doctrine, that liability was

sought by plaintiff Quisenberry to be predicated "upon the 'attractive-nuisance doctrine' which had its origin in the 'turntable cases' * * *," citing the Johns, McCoy and Duron cases.

In the Bihl case, supra, this Court said, citing 6 C. J. 819, San Antonio & A. P. Ry. Co. v. Morgan, 92 Texas 98, 46 S. W. 28 and Simonton v. Citizens' E. L. & P. Co., 67 S. W. 530:

"Generally speaking, an attractive nuisance is a thing which may naturally be expected to allure young children upon private premises, or a thing which has an especial or unusual attraction for young children by reason of their childish instincts. * * . * In order for a thing to constitute an attractive nuisance, it must be so construed or maintained as to constitute an implied invitation to young children. *In other words, the thing or instrumentality must be such that on account of its nature, location, and surroundings it is especially and unusually calculated to attract and does attract young children.*"

■ It is obvious from the above holdings that it is immaterial, so far as the question of liability is concerned, whether a hidden peril be in the teetering condition of a tubing rack on its frame (as in the Quisenberry case) or (as in the present case) in an abandoned excavation filled with water. It is of course immaterial also whether the dangerous condition be in close proximity to a path or highway, as is held in some cases, since that fact merely bears on whether the presence there of members of the public is reasonably to be anticipated. Whether the dangerous condition is an "attractive nuisance" is also merely a circumstance bearing on the same question. It is manifest from the above holdings that whether the facts bring the case within the rule respecting pitfalls and dangerous conditions are adjacent to highways or by-paths, is not determinative as a matter of law of the question of implied invitation, or the owner's liability, but may be such, (as in the present case), to raise and support special issues on the subject. Certainly this is true if it is a matter of common knowledge, as held in Williams v. Kansas City, C. C. & St. J. Ry. Co., 222 Mo. App. 865, 6 S. W. (2d) 48, "that many boys every years lose their lives by drowning"; and that the number of deaths of those visiting ponds and lakes to swim and play, in comparison to the number visiting such pools for such purposes, is comparatively small. Nor is it important for what purpose a person (impliedly invited) enters premises on which a dangerous condition is maintained, provided his presence there is reasonably anticipated. Nor is it important, for the same reason, whether the dangerous condition is visible from traveled ways.

■ What appears to correspond with the view of this Court as to the present case being one of negligence, was later expressed in the Best case, supra, by Chief Justice Hughes, as follows:

"The question is one of negligence, * * * and * * * that while 'temptation is not invitation', it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation * * *." (291 U. S. 411, 54 Sup. Ct. 490).

■ It is pertinent as showing the general law on the subject in other jurisdictions to quote from 38 Amer. Jur., Negligence, Section 142, pp. 802-4:

"While the doctrine (attractive nuisance, sometimes called turntable) has been variously stated, courts which accept it generally are in substantial accord with the proposition that one who maintains upon his premises a *condition*, instrumentality, machine, or other agency which is dangerous to children of tender years, by reason of their inability to appreciate the peril therein, and which may *reasonably be expected to attract children of tender years to the premises, is under a duty to exercise reasonable care to protect them against the dangers of the attraction, * * *.*" (Emphasis ours). See in this connection Montgomery-Ward Co. v. Ramirez (Civ. App.), 127 S. W. (2d) 1034. Also pertinent is the following excerpt from Prosser on Torts (1941) under the subheading "Trespassing Children";

"Accordingly two-thirds of the American courts have developed a doctrine, which has been sadly miscalled by the name of 'attractive nuisance', making the occupier of land liable for conditions on it which are highly dangerous to trespassing children. This doctrine, which has aroused endless discussion, is surrounded by no little confusion, * * *. *The better authorities now agree that the element of 'attraction' is important only in so far as it may mean that the trespass is to be anticipated, and that the basis of liability is merely the foreseeability of harm to the child. * * *.*" (Emphasis ours).

As showing a trend of the law along the same line in other jurisdictions, see Angelier v. Red Star Yeast & Products Co., 215 Wis. 47, 254 N. W. 351, (the court overruling its former opinions, Zartner v. George, 156 Wis. 131 and Lewko v. Milling Co., 179 Wis. 83, 190 N. W. 924); Gimmestad v. Rose Bros., 194 Minn. 531, 261 N. W. 194; Wolfe v. Rehbein, 123 Conn. 110,

193 Atl. 608; Parsons v. Appalachian Electric Power Co., 115 W. Va. 450, 176 S. E. 862, 100 A. L. R. 615, and 47 C. J. 757. See also Restatement, Torts, Sec. 339, which reflects the result of the labors of the American Law Institute in working out along a line not inconsistent with the above holdings a rule calculated to justly balance the rights between an occupant of land (who has created thereon a dangerous condition, particularly to children) and a person whose injury was proximately caused by such condition.

The Court of Civil Appeals, in applying in this case the law as declared in the Flippen-Prather case, was well within the holdings of that case, as well as the other cases cited above as controlling. The controlling facts parallel closely the facts of this case. A Dallas addition on which a dangerous water hole created by enlargement from an abandoned well), unguarded and without utility to the owners of the addition, was in the process of being developed and marketed when Vernon Mather was drowned in it. Reference was made by the court to Dobbins v. Missouri, K. & T. Ry. Co., 91 Texas 61, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep., 856, (cited by appellant as controlling in the present case) but the Court of Civil Appeals did not follow it, saying merely that the case was not ruled by it" *or by any case cited by appellant * * * in conflict with the views * * * (there) expressed."* (Emphasis ours). The question of the basis of liability as presented in that case was squarely before the Supreme Court on application by the owners of the addition for writ of error wherein it appears they relied primarily on the Dobbins case. In refusing the application for the writ the Supreme Court committed itself to the correctness of the law as declared by the Court of Civil Appeals in the Flippen-Prather case, and as applied in the present case.

This is a type of case that rests on its own facts and circumstances. The governing rules and principles, although well established, should be applied with caution; that is, they should be given application only when the controlling facts bring the case well within such rules and principles.

It is obvious from what has been said that no new rule of liability on the part of occupants of real property is announced here, and that such occupants in constructing or maintaining tanks, water reservoirs, or devices of any kind, for use on their lands, are under no greater burden with respect to creating dangerous conditions thereon than has heretofore rested upon them. The governing rules and principles have been regarded

from the beginning as among those which should be cautiously applied.

We overrule all of the points of error presented in the application of petitioner and affirm the judgment of the Court of Civil Appeals which affirms that of the trial court. It is so ordered.

Opinion delivered February 4, 1948.

Mr. Justice Garwood not sitting.

Rehearing overruled March 17, 1948.

MR. JUSTICE FOLLEY, dissenting.

I cannot agree with the majority opinion allowing a recovery against the petitioner Banker under the attractive-nuisance doctrine for the drowning of respondent's five-year-old son. In my judgment, the holding is squarely in conflict with prior decisions of this court and is against the overwhelming weight of authority of other jurisdictions. To demonstrate my position, it is necessary to make an additional statement which will include some very material facts which were omitted from the majority opinion.

To get the true picture of the situation, it should be stated at the outset that the addition where the drowning occurred, and the whole surrounding territory, is a low, swampy, woody, brushy, coastal country, filled with water holes, pits, ditches, reservoirs, ponds and pools, both natural and artificial. The pit or pool in which the little McLaughlin boy drowned was one of the water holes in this territory which had been made some few months prior to the drowning by scraping and hauling out the dirt therefrom with which some of the streets of the addition were improved for the benefit of its inhabitants. It is located on Lot 10 of Block 7 of the Forest Park Addition, which is about the middle of the block both north and south and east and west. To visualize the local setting, I call particular attention to the plat attached hereto. The plat, of course, is greatly reduced in size from the original, and the scale is thus inaccurate. However, the true distances may be seen from the length and breadth of the lots and streets indicated on the plat.

McLaughlin's home was situated on Lots 15 and 16 of Block 1, some 300 or 350 yards from the pool. The addition is about

two blocks from the Port Arthur-Orange Highway and is adjacent on the west to what is known as the Old Shell Road or

FOREST PARK ADDITION
SITUATED IN
JOHN JETT & TOM BOWLES SURVEYS
ORANGE COUNTY TEXAS
AUG 1945    SCALE 1-INCH : 100 FEET

Old Highway 87. It is a rural subdivision nine miles from Port Arthur, the nearest town. Most of the fifty homes in the addition were situated in Blocks 1 and 2, facing the Old Shell Road. There were no houses or other improvements in Block 7, and that block was open, undeveloped, pasture land, grown up with tall bushes, shrubs, weeds and grass. *None of its lots were sold or were being offered for sale at the time of the drowning.* In Block 6 there were only three houses, and they faced on Holly Street. One was situated on Lots 7 and 8 and another on Lots 9 and 10. A third was north of these two but its exact location was not shown. The one on Lots 9 and 10 was the nearest house to the pool in the whole addition, and it was some 700 feet away. The majority opinion leaves the impression that the closest house to the pool was "about 150 or 200 feet." That was at the time of the trial; but no house was that near at the time of the drowning, which is the only time here involved. There were also no houses in Block 5. Gum Street, which runs in front of Block 7 where the pond was situated, was unimproved and there was no travel upon it. The south end of it was closed up by a fence. Only the west half of Oak Street was improved. The pond was thus located in an isolated portion of the subdivision. The only approach to it was a dim trail made several months before by trucks hauling out dirt from the excavation. In the meantime this abandoned road had grown up in weeds and grass. It was certainly no invitation for travel. There were many trees between the pool and McLaughlin's house. The pool itself was in the middle of Lot 10, which lot the plat shows was 396 feet long. The nearest edge of the pool was therefore about 150 feet from Gum Street, and the pool was surrounded by shrubbery, bushes, tall weeds and grass. Even McLaughlin admitted, and all the testimony showed, that it could not be seen from Gum Street where, as above stated, there was no traffic. McLaughlin stated "that if a person didn't know the hole was back there they couldn't see it from the road at all." Its view was screened by trees and bushes from any of the traveled or inhabited portions of the addition. Thus we are not dealing with an open and visible pool near a traveled roadway, but one entirely secluded from the public view.

While McLaughlin testified that children were accustomed to swimming in the pool he cited no single occasion they had done so, and admitted he had been to the place only one time before the date of the drowning. He called in three of his neighbors to furnish the testimony on the issue of proximate cause. They were his only witnesses on this question. They were W. W. McRae, Elmer S. Wagner and Howard Morris. Each of them

lived near McLaughlin in the vicinity of the pool. McRae and Morris were the two who found the boy's body in the water soon after he was drowned. McRae had not known of any boys going to the pool prior to the day of the tragedy. Wagner had seen a few boys playing near the pool upon one occasion, but they were not in the water. He further stated that "the smallest children that I saw there were around twelve years of age." Morris did not even know the pool was there before he was summoned by neighbors to help find the missing boy. He had to be shown the way to the pool. His exact words were: "That was my first knowledge there was even a hole in that community." The petitioner Banker had never seen any children in or around the pool; no one had ever informed or warned him of their presence; he did not know the pool was used for swimming; and he further stated that, since the pool was "back in the field, off the highway" where nobody lived and "where nobody needed to go by it", it never "occurred to me that anybody would be messing around back there."

McLaughlin testified that he knew the pool was dangerous but never complained to any one about it, though C. O. Dumb, Banker's agent, lived across the street in front of him. The only testimony that the pool was any different from any other in that locality was from McLaughlin himself, and his evidence was merely that the other pools were "running pools," which, in my judgment, is a distinction without a material difference. All the other testimony was to the effect that Banker's pool was no more attractive to children than any other pool in the neighborhood. We do not have to depart from McLaughlin's own witnesses to arrive at that conclusion. Morris was not questioned on the matter. He did volunteer the information, however, that there was another hole of similar nature about two miles "up the country," known as the "Blue Hole," in which he had been swimming with his children the same afternoon the boy was drowned in the Banker pool. But McRae and Wagner were questions about the alleged unusual nature of the pool. McRae stated that some of the pools in that neighborhood were larger than others but that there was "nothing more attractive about this pool than any other pool." Wagner's testimony was that he did not "notice anything particularly attractive about this pool to children that would be more attractive to children of that age than any other pool in the neighborhood." That was the testimony of McLaughlin's own witnesses which stands uncontroverted by any other witness; and thus the jury finding on the question is wholly unsupported by any evidence of probative force.

Further evidence that there was nothing unique or unusual about the Banker pool is the fact that there was another pool in the same vicinity which in all material aspects was identical with it. This other belonged to Mrs. Carrie Ray, whose land adjoined the subdivision. Her pool, which was about 10 feet deep, had been there for more than seven years. Incidentally, it was made in the same manner and for the same purpose as the Banker pool. From it material was secured with which to improve the streets and roads in the neighborhood. It was situated about 900 feet north of the Banker pool at the north edge of Block 7 and adjacent thereto. It may be seen on the plat. From her own testimony it appears that the only inclosure about it was barbed wire fence of three strands inclosing her entire pasture, which only incidentally inclosed the pool, and it did not contain all the water. Part of it came out under her fence and over onto the vacant pasture land of the petitioner in Block 7. An examination of the plat will reveal that projection. She further testified that although she had erected warning signs at the site, they had long since been torn down by the many boys who had entered freely through her fence and had swum in her pool frequently for several years prior to the tragedy. Thus her fence and warning signs had availed her nothing. Being partly inclosed in her pasture she naturally used it for watering purposes. But Banker's pool also had a useful purpose, if the use to which it was put makes any difference, of which question I am doubtful in most instances, and particularly in this one. Banker testified he had two purposes in digging the pit. One was to obtain material "through a country you couldn't grade" to improve the streets for the benefit of the inhabitants of the area. The other was to "provide for a reservoir for irrigating gardens for persons who might purchase that adjoining land." Moreover, the evidence of McLaughlin's own witness, Elmer S. Wagner, shows that the pool had been, and was being, used as a watering place for cows and horses belonging to residents of the addition. Thus its use was identical in essential aspects to the Ray pool and others in the vicinity.

One other fact should be stated. From the testimony of the neighboring women it was shown without controversy that the deceased was permitted by his parents upon numerous occasions to wander around unattended in the neighborhood, in the streets, up and down the Old Ferry Road, and down as far as the "Silver Slipper," about two blocks from his home, where there was a canal of running water. One of these women had talked with Mrs. McLaughlin at different times about the danger of the child's playing out in the public road.

In view of these facts, I think it must be conceded by all the members of this court that the deceased was a trespasser upon the premises of petitioner, from which no liability arises, unless it can be said that he was impliedly invited to the pool because of its unusual or especial attractiveness, or unless he met his death by reason of some hidden danger other than the water itself. Maruska v. Missouri, K. & T. R. Co., 10 S. W. (2d) 211 (writ refused). The latter premise rests upon the breach of the duty imposed by law upon the owner to keep his premises reasonably safe even to an uninvited person. I do not agree, however, that the sharply slanting banks or the muddy waters, shown by the testimony, were sufficient to constitute a hidden danger within the meaning of the rule. We judicially know that most ponds and pools of this character have precipitous banks and muddy waters, and thus it contained no unusual or distinguishing features not contained by other pools. Moreover, a full answer to that theory is that had the banks been less precipitous the pool would still have been dangerous to a five-year-old child unattended, and if the water had been clear, not even an adult could have determined its depth before entering the pool. I think we are therefore confined to the sole question as to whether the pool itself, under the existing circumstances, constituted an attractive nuisance within the meaning of the law.

There might be some efficacy in the holding of the majority had this court not heretofore spoken on the question in unmistakable language, language upon which the petitioner and every other citizen of this state had the right to rely as stare decisis of the question, and govern his conduct accordingly, at least until this court in this opinion, and I think without authority of law, announces a different rule.

I refer, of course, to the well-known, often-cited, and, prior to this decision, the never-overruled or criticised case of Dobbins v. Missouri, K. & T. Ry. Co. of Texas, 91 Texas 60, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep. 856; involving facts much more favorable to the plaintiff than those of the instant case. That case involved the drowning of a three-year-old child in a pool of the railway company formed by insufficient culverts and sluices to carry off the water from its roadbed. That pool served no useful purpose. It was within 200 feet of the child's home in a thickly-settled neighborhood, and within two or three feet of the platform of the company's freight and passenger station. From the platform a path within ten feet of the pool led to a store and postoffice, which path was generally used by the employees of the company. As shown by the opinion,

the evidence justified findings "that the pool was attractive and dangerous to little children of the age of the deceased; that such children, including deceased, had before often played around same; that no precautions were taken by the company to prevent such children from getting into it; that the company was some time before the accident informed of such facts, and requested by plaintiff to remove the pool, which was not done." On the occasion of the drowning, the child, who lived in the company's section house, escaped from home without negligence on the part of its parents, and was drowned in the pool. In that case, in the face of a jury verdict in favor of the plaintiff, this court held in no uncertain terms that there could be no recovery under the attractive-nuisance doctrine. This court, speaking through Justice Denman, with the approval of Chief Justice Gaines and Associate Justice Brown, disposed of the question in the following language:

"The common law imposes no duty upon the owner to use care to keep his property in such condition that persons going thereon without his invitation may not be injured. In considering the question as to whether a duty exists, there is no distinction between a case where an infant is injured and one where the injury is to an adult, though where the duty is imposed the law may exact more vigilance in its discharge as to the former. If there be no duty, the question of negligence is not reached, for negligence can in law only be predicated upon a failure to use the degree of care required of one by law in the discharge of a duty imposed thereby. Since the common law imposes no duty on the railroad to use care to keep its right of way in such condition that persons going thereon without its invitation may not be injured, and since there is no evidence in the record from which the jury could have found such an invitation to the child, it was no more liable in law for its death than would have been a neighbor had it wandered into his uninclosed lands and been drowned in his tank or creek, or been killed by falling down his precipice."

In that same case the court discussed the famous "Turntable Cases," 17 Wall 657, 21 L. Ed. 745, which there, as here, were relied upon for recovery, and, in dismissing the plaintiff's contention in that respect, the court further said:

"* * * The difficulty about these cases is that they either impose upon owners of property a duty not before imposed by law, or they leave to a jury to find legal negligence in cases where there is no legal duty to exercise care. In these cases the courts, yielding to the hardships of individual instances

where owners have been guilty of moral, though not legal, wrongs, in permitting attractive and dangerous turntables and water holes to remain unguarded on their premises in populous cities, to the destruction of little children, have passed beyond the safe and ancient landmarks of the common law, and assumed legislative functions imposing a duty where none existed. As a police measure, the lawmaking power may, and doubtless should, without unduly interfering with or burdening private ownership of land, compel the inclosure of pools, etc., situated on private property in such close proximity to thickly settled places as to be usually attractive and dangerous, and impose criminal and civil liability, or both, for failure to comply with the requirements of such law. When such a duty is imposed, the courts may properly enforce it, or allow damages for its breach, but not before."

The exhortation contained in the last-quoted portion of the opinion with reference to the necessity of legislative action in drowning cases might be a worthy and wholesome solution of the hardships in individual instances of this character, but I join Judge Denman and his illustrious associates in the thought that we should not by judicial decree impose a duty upon owners of property not heretofore imposed by the common law, particularly since we have concluded otherwise in every expression of this court where the exact question here involved was in issue.

However, the Dobbins case was not the first expression of this court upon the fundamental issue involved. Theretofore in Missouri, K. & T. Ry. Co. of Texas v. Edwards, 90 Texas 65, 36 S. W. 431, 432, 32 L. R. A. 825, this court announced through Chief Justice Gaines the following general principles, which speak so eloquently here:

"* * * With reference to children, there is still another class of cases which go a step further, and hold that the owner of land may not place upon it dangerous machinery, which is alluring to children, without securing it, so as to protect them against injury while tampering with it. To this class belong what have become commonly known in legal parlance as 'The Turntable Cases'; such as Evansich v. Gulf, C. & S. F. Railway Co. (in this court) 57 Tex. 123, and Sioux City & P. Railroad Co. v. Stout (in the supreme court of the United States), 17 Wall. 657. This line of decision has not been uniformly followed, and has met with much adverse criticism, and it seems to us that with respect to the care which the owner of land is required to exercise in order to secure from injury children who may trespass upon it they go to the limit of the law. They

proceed upon the ground that turntables are attractive to children. In both of the cases cited stress was laid upon this fact, and also upon the fact that the use of the turntables by children was known to the servants of the defendants. The ruling in these cases must be justified, we think, upon one of two grounds; either that the turntables possess such peculiar attractiveness as playthings for children that to leave them exposed should be deemed equivalent to an invitation to use them, or that, when unsecured, they are so obviously dangerous to children that, when it is discovered that they are using them, it is negligent on part of the owner not to take some steps to guard them against the danger. But when it is said that it is enough that the object or place is attractive or alluring to children, and when it is said, as has been intimated, that the fact that they resort to a particular locality is evidence of its attractiveness, the question suggests itself, what object or place is not attractive to very young persons who are left free to pursue their innate propensity to wander in quest of amusement? What object of all unusual is exempt from infantile curiosity? What place, conveniently accessible for their congregation, is free from the restless feet of adventurous truants? Here the language of an eminent judge in disposing of a similar case is appropriate: 'There are streams and pools of water where children may be drowned; there are inequalities of surface where they may be injured. To compel the owners of such property either to inclose it, or fill up their ponds and level the surface so that trespassers may not be injured, would be an oppressive rule. The law does not require us to enforce any such principle, even where the trespassers are children. We all know that boys of eight years of age indulge in athletic sports. They fish, shoot, swim, and climb trees. All of these amusements are attended with danger, and accidents frequently occur. It is part of a boy's nature to trespass, especially where there is tempting fruit; yet I never heard that it was the duty of the owner of a fruit tree to cut it down because a boy trespasser may possibly fall from its branches. Yet the principle contended for by the plaintiff would bring us to this absurdity, if carried to its logical conclusion. Moreover, it would charge the duty of the protection of children upon every member of the community except their parents."

That same general rule was again announced by this court in San Antonio & A. P. Ry. Co. v. Morgan, 92 Texas 98, 46 S. W. 28, in the following language:

"It has been contended broadly that when an owner places

or permits anything upon his property which is attractive to others, and one is thereby induced to go thereon, the invitation may be inferred as a fact by the court or jury. Now, since it is manifest that to some classes of persons, such as infants, the things ordinarily in existence and use throughout the country, such as rivers, creeks, ponds, wagons, axes, plows, wood-piles, haystacks, etc., are both attractive and dangerous, it is clear that the adoption of such a broad contention would be contrary to reason, lead to vexatious and oppressive litigation, and impose upon the owners such a burden of vigilance and care as to materially impair the value of property and seriously cripple the business interests of the country. Therefore it has been generally held that the invitation cannot be inferred in such cases. These cases rest upon the sound principle that, where the owner makes such use of his property as others ordinarily do throughout the country, there is not, in legal contemplation, any evidence from which a court or jury may find that he had invited the party injured thereon, though it be conceded that his property or something thereon was calculated to, and did, attract him."

This court again spoke on the precise question here presented when it refused a writ of error in Maruska v. Missouri, K. & T. R. Co., 10 S. W. (2d) 211. That was a suit for damages for the drowning of a seven-year-old boy in the railway company's artificial lake near Granger. Between the city limits of Granger and the lake there was a cotton yard, privately owned, 600 feet wide, and on the south side of the lake. On the south side of the cotton yard there was a street on which there were numerous residences. The street was the nearest highway to the lake on that side. To the west and north of the lake were farms, and on east, across the railroad, there was a highway. The deceased, and a companion of the same age, crossed the cotton yard, climbed through a fence, and went to the lake to catch crawfish. In play each threw the other's hat in the lake. Deceased's hat blew across the lake. He went some distance around the lake, climbed through two more fences, waded out in the water and was drowned. The plaintiff urged actionable negligence against the railway company in two respects: (a) inconstructing and keeping a very large, extraordinary and unusual lake immediately adjoining the town of Granger, within a few hundred feet of a thickly-populated portion of the town, and adjoining the common playground for numerous children; and (b) in failing to build, provide and keep in proper repair a fence, safeguard, or other obstruction which would prevent children in the vicinity, who were attracted by the lake, from

going into it. At the close of the evidence the trial court instructed a verdict for the railway company. The court of civil appeals affirmed that judgment. In doing so the court used the following language, which this court expressly approved:

"Liability in this case is predicated upon the rules laid down in what is commonly known as the 'turntable cases,' that is, the doctrine of 'attractive nuisances.' Appellants cite only three cases. San Antonio & A. P. Ry. Co. v. Morgan, 92 Texas 98, 46 S. W. 28; Stamford Oil Mill v. Barner, 103 Texas 409, 128 S. W. 375, 31 L. R. A. (N. S.) 1218, Ann. Cas. 1913A, 111, and McCoy v. T. P. & L. Co. (Tex. Com. App.) 239 S. W. 1108. Expressions occur in these cases which, if their facts be ignored, might be construed to sustain appellants' contention. But it is a cardinal rule of construction that decisions are to be construed in the light of the facts on which they are based. Each of these cases involved hidden dangers, in the instrument inflicting the injury, not apparent to those who were injured.

\*  \*  \*  \*  \*  \*

"The size of the lake, in our opinion, is not material. The dangers of a small lake, where deep enough to drown a child, are the same as those of a large one, and the same lure to the child is present in one as in the other. Indeed, the cases disclose that most of such suits have arisen from deaths in pools or small lakes. Apparently the added size of a lake is an added warning both to children and parents.

"In practically all cases where recovery has been permitted, one of two conditions existed, neither of which was present in the instant case; that is, there was either some hidden danger in, upon, or over the lake *other than the body of water itself;* or same was maintained immediately adjacent to or under some highway, public passageway, or place where people had a right to travel." (Emphasis mine).

In a fairly recent case by the Commission of Appeals, in which the judgment was approved by this court, similar principles of law were announced, and in which the Morgan case, supra, was cited with approval as the last expression of this court. That was in the decision of Texas-Louisiana Power Co. v. Bihl, 66 S. W. (2d) 672. In the Bihl case the plaintiff's eleven-year-old son was electrocuted when he climbed an electric light pole of the power company and came in contact with its electric wires near the top of the pole. The pole had been erected by the power company in or near the corner of plain-

tiff's yard. From the top of the pole and running down its side was an insulated ground wire attached to the pole at intervals with staples. This was slack when it should have been tight against the pole. At places it formed loops or loose places which the deceased used in making his fatal climb. The deceased was not a trespasser at the premises where the pole was located. It was contended by the power company that he became a trespasser when he climbed the pole without its permission. It was held that the child was a trespasser when he climbed the pole and that he could not recover on the theory of attractive nuisance. In disposing of the contentions of the parties the court said:

"From what has been said, it is evident that Bihl's right to recover must depend on a holding that the pole and its equipment above shown constituted what is known in law as an attractive nuisance. Generally speaking, an attractive nuisance is a thing which may naturally be expected to allure young children upon private premises, or a thing which has an especial or unusual attraction for young children by reason of their childish instincts. 6 C. J. 819. In order for a thing to constitute an attractive nuisance, it must be so constructed or maintained as to constitute an implied invitation to young children. In other words, the thing or instrumentality must be such that on account of its nature, location, and surroundings it is especially and unusually calculated to attract and does attract young children. * *

"From the record before us it is clear that this boy was not a trespasser on the premises where the pole was located. Also the power company was not a trespasser in locating and maintaining the pole in Bihl's yard.

"The power company contends that under the undisputed evidence the deceased was, as a matter of law, a trespasser when he climbed this pole without its permission. If this was true, Bihl cannot recover. The deceased certainly had no right to climb this pole, and was a trespasser when he attempted to do so, unless it can be said that on account of its nature, location, and surroundings it was so constructed and maintained that it was especially and unusually calculated to attract or impliedly invite children of tender age to climb it. We think the authorities of this state are against such a conclusion. San Antonio & A. P. Ry. Co. v. Morgan, supra; McCoy v. T. P. & L. Co. (Tex. Com. App.) 239 S. W. 1105; Simonton v. Citizens' E. L. & P. Co., supra."

Tested by the rules announced in the above cases it is evident that no liability attaches under the facts of this case. It is also abundantly clear that those decisions have followed the well-recognized weight of authority in the United States.

The general rule in such cases is announced in 20 R. C. L. 96, 97, Sec. 85, as follows:

"Ponds, pools, lakes, streams, and other waters embody perils that are deemed to be obvious to children of the tenderest years; and as a general proposition no liability attaches to the proprietor by reason of death resulting therefrom to children who have come upon the land to bathe, skate, or play. * * * Although, a property owner may know of the habit of children to visit waters upon his premises, he is as a rule under no obligation to erect barriers or take other measures to prevent them being injured thereby. According to some of the decisions, if a pond or pool is in close proximity to the highway, a recovery may be had for the drowning of a young child who has fallen therein; but the weight of authority appears to hold to the contrary, except where the facts bring the case within the rule respecting pitfalls adjacent to highways."

A more complete statement of the rule adopted by the majority of jurisdictions is found in 38 Am. Jur. 818, Sec. 151, where it is said:

"The character of the danger, as open and obvious, or hidden and latent, is an important consideration. The doctrine of attractive nuisance, it has been said, is limited in its application to cases where the danger is latent, and affords no basis for a recovery where the injury complained of was produced by a peril of an obvious or patent character. A danger which is not only obvious but natural, considering the instrumentality from which it arises, is not within the meaning of the attractive nuisance doctrine, for the reason that an owner or occupant is entitled to assume that the parents or guardians of a child will have warned him to avoid such a peril. Pits and excavations on land embody no dangers that are not readily apparent to everyone, even very young children. For this reason, the proprietor is under no obligation, as a rule, to fence or otherwise guard such places, and he will not be liable for injuries to children who may have fallen therein."

A very extended and exhaustive discussion of the question is found in 36 A. L. R. 224, where the annotation states:

"The weight of authority is to the effect that the attractive-nuisance doctrine does not apply to ponds,—at least, where there is no unusual danger."

Also, in 60 A. L. R. 1444, 1453, the statement appears:

"Although a pond of water is attractive to boys for play, swimming, and fishing, the mere fact that it is an attractive agency is not in itself sufficient to subject the owner to liability for accidents."

The annotator cites Williams v. Kansas City, C. C. & St. J. R. Co., 6 S. W. (2d) 48, in which the court said:

" 'That many boys every year lose their lives by drowning is a matter of common knowledge. It is also of common knowledge that the number of such deaths, in comparison to the total number of boys who visit such ponds, lakes, or streams for the purpose of swimming, playing, or fishing, is comparatively small. In our opinion it would be extending the doctrine too far to hold that a pond of water is an attractive nuisance, and therefore that such a case as the one before us should come under the class of Turntable Cases. A turntable can be rendered safe without impairing its usefulness by simply locking it. Not so with a pond, which cannot be rendered inacessible to boys by any ordinary means. Beyond question no ordinary fence would answer the purpose. The pond would need to be either filled or drained, and its usfulness destroyed.' "

The majority opinion cites so many authorities to sustain the holding that it becomes an unreasonable burden to discuss all of them. A casual examination will reveal that they are not remotely in point with the facts of this case and that the law announced in them is not in conflict with the principles above stated. This becomes evident upon a careful analysis of a few of the cases most strongly relied upon by the majority, by the respondent, and by the court of civil appeals.

The first of these is Quisenberry v. Gulf Production Co., 63 S. W. (2d) 248, affirmed by this court, 128 Texas 347, 97 S. W. (2d) 166. There the child was injured when a frame, used on trucks and trailers for hauling tanks of oil, fell from a rack upon which it was not securely fastened. It rocked when a child would get upon it. When the infant mounted the frame and began to rock it, it overturned and injured him. But that child was not a trespasser as is indicated in the following quotation from the opinion of this court:

"The child was not a trespasser, intruder, or licensee upon the premises. He lived with his father, a rent-paying tenant and employee of the company, in a house furnished by the company to its employees, on the company's premises, with access to the entire premises and use thereof for all usual and incidental purposes. This child had a right to be on the premises and therefore was an invitee."

Moreover, there was a hidden danger in the manner in which the oil company had negligently allowed the frame to remain. As further stated in the opinion, the child's "father knew of the unsafe position of this frame rack, and notified the gang pusher of the fact more than once." Thus, the oil company not only had notice of the latent danger but allowed it to so remain, knowing that children played around it. Certainly, having invited the child upon the premises, and knowing the dangerous condition existing, the company was in no position to say it had exercised ordinary care for its protection or that it could not have foreseen the injury. It was not necessary to apply the attractive-nuisance doctrine in that case for the child had the right to be on the premises. In other words, the defective apparatus did not allure the child and constitute within itself an implied invitation, as it must be an attractive nuisance. He was already on the premises by permission of the company, and once being there a lawful relation was thereby established, and the company owed him the duty to use ordinary care for his safety. That duty it failed to discharge, and the case resolved itself, not into one of an attractive nuisance, but one of ordinary negligence.

The same is true of Montgomery-Ward & Co. v. Ramirez, 127 S. W. (2d) 1034. There the defendant was conducting a store in Beeville, and among other things was selling motor-driven washing machines. The machine was placed in the rear of the store because the fumes of the gasoline engine were not desired in the store building. The machine was left unattended except one employee was instructed to notice is occasionally to see that it had not stopped. There was a public passageway at the back of the lot where the machine was operating. The child was not trespassing when he saw the machine but was passing along the public passageway, and, seeing the machine in operation, went upon the private lot of the defendant for the purpose of looking at the machine, and was injured by it. That case turned on the point that the machine was near the public passageway, where the child had a right to travel, and contained within itself a latent danger which was concealed "from the

462

appreciation of children of tender age." It is worthy of note, also that the court indicated in the opinion that the facts of the case were distinguishable from the facts in Texas Public Service Co. v. Laughead, 73 S. W. (2d) 925 (writ refused), where "it appears the children were not attracted to the premises by a cesspool, as they could not see it from the road." Of course, "the question whether the owner or occupant of building or grounds, devoted to business purposes, is under obligation to keep them safe for the protection of persons coming thereon, rests upon a somewhat different principle from that which relates to private ways." Bustillos v. Southwestern Portland Cement Co. (Tex. Com. App.) 211 S. W. 929, 931.

It seems somewhat extraordinary to me that the majority relies upon the Bustillos case, supra, as authority to support a recovery herein. In that case the deceased child entered the premises of the defendant for the purpose of carrying lunch to one of its employees, and, while passing along a footpath, slipped and fell into a burning pit. The path was constantly used by pedestrians, both old and young, with knowledge and consent of the owner. Children were permitted to come to the plant daily for the purpose of bringing lunch to the employees. The errand of deceased was not only for a purpose connected with the business of the defendant, but it was in the interest and for the benefit of the company as a necessary service to one of its employees. The defendant permitted the deceased and other children to come upon the premises and knew they traveled the narrow path bordering the pit. As was further stated in the opinion, the "slightest regard for their safety would have suggested the danger in passing so near a pit beneath the surface of which was concealed a burning mass into which they might accidentally slip and fall." A casual examination of the opinion in that case will reveal that the decision upholding the sufficiency of the pleadings rested solely upon the ground that the deceased was not a trespasser, intruder, or a licensee coming upon the premises without invitation, express or implied, but was an invitee by implication because he entered the premises in the interest and for the benefit of the company. That distinction speaks loudly when compared to the facts of this case.

Of no earthly application is the case of McCoy v. Texas Power & Light Co. (Tex. Com. App.), 239 S. W. 1105. In that case only the sufficiency of the pleadings was involved.. The lower courts had sustained demurrers, and, upon the plaintiff's refusal to amend, had dismissed the suit. The commission of

appeals held, with the approval of this court, that the petition presented a case of actionable negligence against the power company. It was a suit for damages for the death of plaintiff's fourteen-year-old son who was electrocuted when he climbed a steel tower into the danger zone of the power company's electric lines maintained by the power company upon plaintiff's land. The tower had steps or spikes which formed a "continual ladder from a point a few inches from the ground to the top of said tower." That condition was known to the power company and it was further known by it "that children were constantly and frequently using said towers and climbing upon same." The deceased ascended the ladder after he had rightfully entered the premises of his father upon a personal mission of his own. As in the Bihl case, supra, he was not a trespasser while on the ground below the power line, and, as distinguished from the Bihl case, he was not a trespasser when he climbed the tower because the ladder or steps at the foot of the tower were so attractive to a child that the same constituted an implied invitation for him to place himself in a position of peril. That was not true in the Bihl case, and thus the ladder, supplying the invitation, was the distinguishing feature between the two cases, as was recognized in the Bihl case when the McCoy case was cited as authority for the holding that the child therein became a trespasser when he climbed a pole upon which there was no unusual attraction sufficient to constitute an implied invitation. But in both cases it should be noted that the deceased child was not a trespasser upon the premises where the danger existed. That is an important distinction to be observed in all the cases, which fact apparently has been overlooked by the majority herein.

Nor do I think the case of Flippen-Prather Realty Co. v. Mather, 207 S. W. 121, has any application here. There a child was drowned in an old, open, unusual, and abandoned well which had been for seven years surrounded by opened, developed, and paved streets. The well was situated between the deceased child's home and a regularly used school house which was attended by the deceased and many others who lived in the thickly-settled vicinity of Highland Park, a suburb of the City of Dallas. The well was situated in the block adjacent to the school and the children used it for a playground. Immediately surrounding the mouth of the well there was a circular depression which the children used as a "speedway," as they called it, chasing one another around it. It was directly within the path of the children attending the school, which path was daily passed over and used by them in going to and returning from school.

The defendant knew those facts and used no diligence to guard against the calamity which befell the deceased. Moreover, recognizing the dangerous condition of the well, it "had at one time attempted to fill it up, but negligently failed to do so." Thus that case may be distinguished from this for obvious reasons. The well itself was a dangerous instrumentality; it was unusual in the community; it was unusually attractive to children; though its dangers were open, visible and known to the defendant, they were concealed from children of immature judgment; a path led immediately by it where children frequently passed; children constantly played around it; it was openly visible to them; the defendant knew those facts, but did nothing to prevent the injury; and having attempted to fill it up it failed to do so by its own negligence. Furthermore, a different rule applies generally to abandoned and unprotected wells than that which applies to ponds and pools. That distinction was recognized in the opinion in the Mather case when the court quoted language from Coeur d'Alene Lumber Co. v. Thompson, 215 Fed. 8, 131 C. C. A. 316, L. R. A. 1915A, 731, to the effect that a "property owner who leaves an open well unprotected on his property, to which, to his knowledge, actual or constructive, children resort to play, is liable for the death of a child who falls into it and is drowned," and then further stated that the case was not ruled by Dobbins v. Railway Co., supra. It might well have been added that the reason it was not ruled by the Dobbins case was because the latter involved a pool or pond while the Mather case an abandoned and unguarded well, where a diffrent rule applies.

The above cases are the ones chiefly relied upon by the majority opinion. They do not, nor do any of the others cited, involve ponds or pools. In all of them, except possibly the Mather case, the injured child was an invitee and not a trespasser. In the Mather case the liability was based upon the theory that the dangerous thing was so situated and maintained as to attract children from the street or from a place where they were known to be, thus raising the presumption that the guilty party should have foreseen and anticipated the injury. A thorough research will reveal that heretofore in this jurisdiction liability for trespassing children has been limited to accidents arising from hidden and latent dangers, such as defective appliances, unguarded machinery, live wires, open trap doors, abandoned wells, or other similar concealed perils. It has never before been extended to perils of an open, obvious and patent character. Not one Texas case has been found wherein recovery was allowed against the owner of land where a child was

drowned by swimming in, or voluntarily entering, an open pond, lake or pit on private property, not even in those cases where the pond or pool was immediately adjacent to a public road or street and visible from it; and not one case from any other jurisdiction has been found or cited by the parties or the majority opinion wherein the attractive-nuisance doctrine has been applied to injuries in a private pool or pond which contained no artificial features other than the water itself, and where the pool or pond was secluded from the public view or not visible from some public street or road ,as that here involved. Blough v. Chicago G. W. R. Co., 189 Iowa 1256, 179 N. W. 840, 20 N. C. C. A. 219. Consequently, the holding of the majority not only overrules the prior decisions of this court, but it stands alone and unaided by any authority from any state in the Union.

In extending this doctrine into fields heretofore unknown to the law the majority opinion says that it should "be applied with caution," and that no new rule of liability is announced for "occupants in constructing or maintaining tanks, ponds, water reservoirs, or devices of any kind, for use on their lands." If I agree that the use of a pool is always the determining factor, which I do not, that statement seems incredible to me in view of the uncontroverted testimony that the Banker pool had served a useful purpose in the past and was intended as a water reservoir in the future. There is not a farmer or rancher in the state who will hereafter understand his liability in this respect, nor will he know when this court may apply the rule with caution."

Moreover, on the question of implied invitation, we must keep in mind that we are not dealing with a pond open to public view, but one situated on a vacant and secluded block where no lots had been sold and where they were not being offered for sale. This pool could not have allured the child upon the premises because he could not see it from the outside. He was therefore a trespasser before he reached the pool. As late as the case of Gotcher v. City of Farmersville, 137 Texas 12, 151 S. W. (2d) 565, involving a drowning in a cesspool, and where this court held there was no liability, the late and lamented Chief Justice Alexander, speaking for the court on the attractive-nuisance doctrine, stated that in order to invoke the doctrine "it is necessary that the thing or condition alleged to have constituted the attractive nuisance should have been so situated as to entice the child onto the premises, and it is not sufficient that it attracted him after he had already become a

trespasser." The Chief Justice then quoted the *following very* pertinent statement from 45 C. J. 767, Sec. 165, as follows:

"Accordingly, the doctrine is not applicable to a thing or condition which is not visible or discoverable from outside of the premises on which it is situated."

If that was the law of this state then, indubitably it should be the law now.

In conclusion, I do not think the necessary element of proximate cause is present in this case. I do not believe this deplorable tragedy could have been anticipated as probable by the exercise of reasonable forethought, nor could it have been prevented by reasonable precautions. Of course, one might have anticipated the possibility of this sad event; but the danger was comparatively remote. Scattered over the length and breadth of this land, up and down the highways and byways, in and near cities, towns and villages, are innumerable pits, pools, lakes and ponds, both artificial and natural. Occasionally a child or an adult loses his life while wading, bathing or fishing in such a body of water. Under the holding of the majority, not only would the owners of these bodies of water be liable for similar injuries, but also owners of private fish ponds, mill ponds, lily ponds, swimming pools, and other artificial bodies, may be held guilty of actionable negligence unless they result in an intolerable situation. Thompson v. Illinois C. R. Co., 105 Miss. 636, 63 So. 185, 47 L. R. A. (N. S.) 1101.

I, too, believe in progress, but let us not in the name of liberality, in our zeal to compensate for injury, override and overrule our ancient landmarks, and hereby, without legislative sanction, create a liability where none has heretofore existed under the common law or under the solemn decisions and pronouncements of this court.

I therefore respectfully enter my dissent to the opinion of the majority.

Mr. Justice Smedley concurring.

Opinion delivered February 4, 1948.