Ortencia RIOJAS, Appellant,

v.

Ben RIOJAS, Appellee.

No. 15712.

Court of Civil Appeals of Texas.

Fort Worth.

April 20, 1956.

Eugene A. Smith, Houston, for appellant.

W. O. Bowers, III, Austin, for appellee.

RENFRO, Justice.

Suit was brought by Ortencia Riojas, a feme sole, for damages growing out of the death of her sixteen months old son Reynaldo. It was alleged that Ben Riojas, defendant, was guilty of various acts of negligence, causing the death of said child. At the conclusion of the evidence the defendant moved for an instructed verdict, on the ground the plaintiff had failed to establish negligence on the part of the defendant. The motion was sustained and a verdict instructed in favor of the defendant.

The evidence, viewed in the light most favorable to the plaintiff (appellant herein), shows that the defendant was visiting at 119 Delano Street in Houston. He drove down a narrow driveway between two residences. The driveway was about 60 feet long. He parked his car near the garage at the back end of the driveway. He then went in the house and visited for sometime. After concluding his visit he entered his car and while seated in the car talked with his father for approximately 15 minutes. The driveway was just wide enough for cars to pass in and out. The driver had to be careful to keep his car from hitting "the stuff on the north side" and "from hitting the hedge on the other side". Defendant's two children were with him on the occasion. His two children played with his nephews and nieces during the visit. The infant Reynaldo was one of the children playing. They all were playing in the back yard during the visit. While he was sitting in the car his two children got in the car and the other children went to the park. He saw them pass the car while he was talking to his father. He saw four go by but did not see Reynaldo go with them. He thought the children went to the park but he did not know whether they were out in front playing or not. He visited the same house frequently and knew the children always played in the yard. When he concluded his visit with his father and started backing, he opened the door and was looking back to the left-hand side. He was more concerned about

cars going up and down the street than anything else, so was looking to his left, but, according to his testimony, he had to see to his right because he was going south on Harrisburg Boulevard. It was necessary for him to cut his wheels to the left. He was asked, "When you backed out of that driveway you had to pay particular attention to your driving because you were so close to the house you would hit the house?" He answered, "Yes, the house is pretty close." Then to another question he answered, "Yes, I was concerned with looking back and seeing that I was not hitting the house", and in answer to the question, "You were paying particular attention to that part of your driving", he said, "Yes, but I was looking back all the time, and I had my door open." In answer to the question, "You never looked completely from your rear there to your left, completely from where you stopped and go out to the street there", he said, "No, not completely, but I looked on the left side." He was asked, "You just started out, not looking to determine whether small children were anywhere near", and he answered, "I didn't see any children." Then again, "Did you ever look around to determine where the small children were before you started backing up?" He answered, "No, sir, I just glanced back." In a deposition taken soon after the accident he had testified, "No, I didn't look back." He further testified: "When I was talking with my father I didn't look all the way back to see. It was impossible to drive the car and look all the way back, but I did look back the sides. Q. How far back would you say, 3 to 5 feet? A. Oh, that far." He backed out of the driveway at a speed of "5 or 10 miles, 5 or 6 miles" per hour. He did not change his rate of speed during the 50 or 60 foot traveling distance to the street until he got to the street when he slowed enough to turn to the right and see if there was a car coming from the south. As he approached the street he was very close to the sidewalk and did not know what was on the cement driveway behind him. The first he knew of the presence of the child Reynaldo was when a girl next door screamed. At that time the front wheels were in the driveway and the back wheels were in the street. He did not know what part of the car struck the child but when he first saw the child after the accident the child was standing on the sidewalk by the right wheel on the front side. When he stopped the car it was about 6 or 8 feet from the child.

The witness Vasquez testified he thought the left front wheel ran over the baby. When he first saw the baby it was sitting down, facing Canal Street to the north, playing with a pile of sand. The child was about a foot from the west edge of the sidewalk. He saw the car coming out of the driveway but did not see the driver. "When it passed he jerked back and the front wheel hit him." (It is not clear whether the baby or the driver jerked back.) When he first saw the child it was about a foot "from the sidewalk and the driveway" on the side of the driveway close to his grandfather's house.

The plaintiff's pleadings alleged numerous acts of negligence on the part of the defendant, which included allegations that the defendant failed to keep a proper lookout, failed to ascertain the whereabouts of Reynaldo before backing out of the driveway, and failed to ascertain there were no children on the driveway and walk at the time in question.

▇ In determining whether a trial court's action in granting a motion for instructed verdict was proper, the appellate court will view the evidence in the light most favorable to the losing party, it will disregard the conflicts in testimony, and it will indulge, in favor of appellant, every intendment reasonably deducible from the evidence. White v. White, 141 Tex. 328, 172 S.W.2d 295; Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256; Rodgers v. Tracy, Tex.Civ.App., 242 S.W.2d 900.

▇ If the circumstances are such that reasonable minds might draw different conclusions as to the issue involved, then such issue should be submitted to the jury.

In other words, before the court is authorized to take a question from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. St. Louis, S. F. & T. R. Co. v. Houze, Tex.Civ.App., 28 S.W.2d 865.

■ In the instant case the defendant by his own testimony knew that small children habitually played in and around the yard and driveway. He knew they had been so playing a mere matter of minutes before he started his car. He had seen Reynaldo playing with the others. He did not see Reynaldo leave with the others. His testimony as to when and where he looked, if not confusing, is, to say the least, inconclusive.

A proper lookout is such lookout as a person of ordinary prudence would keep under the same or similar circumstances.

■ In view of the testimony and all the surrounding circumstances as shown in the record, we are of the opinion reasonable minds could have concluded that defendant failed to keep a proper lookout on the occasion in question. Thus, a fact question was presented which should have been submitted to the jury.

■ The defendant also contended in his motion for instructed verdict that there was no evidence of damage.

The evidence in this type of case from the very nature of things cannot furnish the measure of damages with that certainty and accuracy with which it may be done in other cases and, therefore, the question of damages must be left largely to the discretion of the jury. Banker v. McLaughlin, Tex.Civ.App., 200 S.W.2d 699, affirmed in 146 Tex. 434, 208 S.W.2d 843, 8 A.L.R.2d 1231; Anderson v. Broome, Tex.Civ.App., 233 S.W.2d 901.

■ There was sufficient evidence to have supported a finding of some damages.

Reversed and remanded.