Glen Doil **WOOLF** et ux., Appellants,

v.

**CITY OF DALLAS** et al., Appellees.

No. 15358.

Court of Civil Appeals of Texas.

Dallas.

Jan. 17, 1958.

Rehearing Denied March 14, 1958.

Ross K. Prescott and Eades & Eades, Dallas, for appellants.

Brundidge, Fountain, Elliott & Bateman, Carter, Gallagher, Jones & Magee, H. P. Kucera, City Atty., and Ted P. MacMaster and Arthur Schroeder, Jr., Asst. City Attys., Dallas, for appellees.

CRAMER, Justice.

Appellants were plaintiffs and appellees were defendants in trial court and will be referred to as in the trial court in this opinion. Plaintiffs sought recovery for damages based on negligence against Luella Carver resulting from the alleged wrongful death of their four-year old child as a result of his drowning in a pool of water on property owned by Luella Carver, and against the City of Dallas who are alleged to have created and maintained the dangerous condition partly on city property. The parties to this appeal entered into an

agreement in writing in the trial court signed by the attorneys and all of the parties. Under such agreement the parties agreed in substance that the entire record of the evidence for the purposes of this appeal shall consist of the affidavits of (1) W. H. Buck, (2) H. H. Stirman, (3) Roy H. Briscoe, (4) Mrs. Luella Carver, (5) Ruth Harper, (6) Mrs. Lena M. Luck, (7) Mrs. Emma Harper, (8) Clarence Hudnall, Sr., and the controverting affidavits of (9) Mrs. Glen Doil Woolf, (10) Glen Doil Woolf, the oral deposition of (11) Mr. Glen Doil Woolf, (12) two photographs of Knight's Branch running under Maple Avenue, and a survey plat of Maple Avenue and Knight's Branch.

Defendants City of Dallas and Luella Carver each filed a motion for summary judgment and both of such motions were sustained and judgment entered that plaintiffs take nothing. This appeal has been duly perfected by Mr. and Mrs. Woolf alone, they briefing here five points of error countered by three counterpoints. The points were, in substance, error in rendering summary judgment against appellant-plaintiff because (1) genuine issues of material facts were shown by the pleadings, the depositions and affidavits on file; (2) the evidence showed plaintiffs' child was a tenant of defendant and disputed issues of fact were raised as to whether or not (a) defendant owed such child the duty under the particular circumstances, and (b) defendant was negligent, and (c) such negligence was a proximate cause of the death of the child; (3) because the trial court erred in rendering summary judgment for Luella Carver on the theory that plaintiff Woolf had failed to show liability under the attractive nuisance doctrine, this being a negligence case and it is shown that Carver owned and maintained the pool of water in which the child was drowned and the evidence raised issues as to creation, condition and maintenance of the pool by Carver, the existence of dangerous objects in the pool, her conduct with respect thereto, her knowledge that children would frequent the place, her knowledge that such condition involved unreasonable risk of danger to children and was unusually dangerous and that the cost of eliminating such danger was slight; (4) in rendering summary judgment against plaintiff "because genuine issues of fact were shown by the record herein and said defendant was not entitled to judgment as a matter of law." (5) Because genuine issues of fact were shown to exist as to whether or not the pool of water where the child drowned was located on public property.

Defendant countered by three counterpoints, in substance, that affidavits of plaintiffs taken in connection with the deposition of plaintiff's wife affirmatively show they had been in Dallas about four years and that while they lived in a trailer park within a city block of the pool, they had not seen it prior to their son's drowning and were therefore incompetent as witnesses to testify that the pool in which their son drowned was not a part of the natural waterway of Knight's Branch; that it had not remained in its approximate size and depth, but had become deeper from year to year for the past ten years because of the maintenance by the city of a drainage waterway which ran through a culvert or pipe under Maple Avenue and the court therefore on the hearing properly disregarded all those portions of plaintiffs' affidavits; (2) plaintiff showed no breach by the defendants of any duty to plaintiffs in that it was established without competent evidence to the contrary that Knight's Branch is a natural creek or stream and that the pool in which plaintiffs' son was drowned was formed by a natural part of its present condition, size and depth, for approximately 50 years without being affected by any act of either defendant which in any manner changed the course of the stream or the size or the depth of the pool; therefore defendants were entitled to judgment as a matter of law; (3) the affidavits of the city show in connection with the survey that the city had neither ownership nor control of any portion of Knight's Branch at the point where plaintiffs' son was drowned and no portion of Knight's Branch at said point was located on public property, the edge of the pool being located

on private property 12 feet west of the Maple Avenue right-of-way line and the counter affidavits of appellants attempting to create a fact issue as to boundary line between Maple Avenue and the Carver property were without probative force because affiants were not and are not surveyors and the affidavits do not show appellants are competent to testify as to matters in such affidavits based on hearsay and mere conclusions of fact not admissible; therefore the trial court did not err in granting the city's motion for summary judgment. All points will be considered together. They require a discussion of the material portions of the affidavits and exceptions before the trial court. Luella Carver, a defendant, in substance material here stated in her affidavit that she owns and operates the Inwood Trailer Park. The land on which it was located was purchased by her father in 1903 and she has owned an interest in the property since her mother's death in 1940 and has lived within two blocks except for two years all her life in the vicinity of the property; that she acquired by purchase the interests of other heirs in 1945 and has been sole owner since then; that she is thoroughly familiar with the property, the stream of water, etc., and has been all her life. "The pool or pond of water in which Jackie Land Woolf is alleged to have drowned is a part of that natural stream or waterway and has been part of it, in its present size and depth, at least as far back as 1895 when I was born. The so-called pond or pool is merely a wide place in the said Knight's Branch and, so far as I know, has always been there in its present size and condition. My brothers and sisters and I, as well as my children, and as well as all the other children in the neighborhood for the past sixty years have played and learned to swim in the said stream and the said pond. The property through which this stream passes has been owned by my family since 1903; and I know of no way I could effectively or lawfully remove or destroy the said stream or the said pond or pool of water or fence the same off in such manner as to keep children away from the water therein."

Clarence Hudnall, Sr., by affidavit, in substance, stated he is 75 years old, was born and lived near what is now 5317 Maple Avenue, about a quarter of a mile from where Maple Avenue crosses over Knight's Branch, is familiar with the stream which is below the bridge and of his own knowledge knows there has been no substantial change in the course, depth or size of the stream or the depth of the pond or pool just below the bridge during the last 56 years. It has been his observation that practically all natural streams have ponds or pools in them where due to different soil conditions there is natural erosion, and the pond or pool on Mrs. Carver's property is the same general nature as similar streams in Texas. Mrs. Emma Harper by affidavit, in substance, is a widow 70 years of age, resides on Inwood Road, has lived near the property in question, as located, since about 1906, all but about a month. Her home is about one block from where Knight's Branch flows under Maple Avenue; is thoroughly familiar with the neighborhood and it is substantially the same as it has been all the time during the past 51 years; that neither the City of Dallas nor Mrs. Carver has done anything to change or alter its course, its depth or to enlarge it. The pool is merely a wide and deeper place in the stream such as may be found in nearly all streams. Mrs. Lena Luck by affidavit stated she is a widow, 59 years of age, lives on Cedar Springs Road, moved to Dallas about 53 years ago and for the past 43 years has lived about a half mile from where Maple Avenue crosses Knight's Branch. She has been familiar with conditions at that point for 53 years; it has been a natural stream or waterway during all of that time. The pond here involved is a part of the stream and the situation has not changed materially in size, circumstance, diameter or depth in the past 53 years. She has seen children swimming in the pool; that neither Mrs. Carver nor the city has done anything to change the flow or enlarge the pool or pond involved. Mrs. Ruth Harper by affidavit stated she is the daughter of Mrs. Emma Harper and L. S. Harper, deceased; resides at 6923 Inwood

Road and that during the last 47 years most of the children in the neighborhood during most of that time played in the bed of Knight's Branch below where it flowed under Maple Avenue, weather permitting most of them including her brother played or swam in the pool or pond below Maple Avenue Bridge on Luella Carver's property. Conditions there have not changed in the past 50 years and nothing has been done in that time by either Mrs. Carver or the City of Dallas to change the course, depth or size of the pool involved. H. H. Stirman by affidavit, in substance, stated he is Director of Public Works for the City of Dallas and has personal knowledge of the place involved here; that the City of Dallas did not create the hole in the creek bed of Knight's Branch on the west side of the bridge crossing Maple Avenue, and its condition is the same; that the city has no control over the property and that the pool involved existed prior to the time the area was annexed to the City of Dallas. W. H. Burke, Engineer of Surveys and Records of the City of Dallas, in an acknowledged instrument stated there was made under his direction a correct survey and sketch of the place where Jackie Land Woolf was drowned and that no part of the property is owned by the city. Such sketch was:

Roy H. Briscoe by affidavit, in substance stated he is a registered engineer, employed by the Public Works Department of the City of Dallas, making all types of surveys on the ground as directed by W. H. Burke, Engineer of Surveys and Records of the City of Dallas. On September 11, 1956, under order of Mr. Burke he made an actual survey on the ground of Lot 32, Block 2371, City of Dallas, giving full description thereof, and stated that the pool involved is a natural pool located in Knight's Branch, and on his personal examination of the pool, stated it is a natural pool and there is no evidence that the city has ever done, or hired done, anything to change or alter the natural flow of such stream or to deepen such pool in which Jackie Land Woolf was drowned.

Reply affidavits were filed by Glen Doil Woolf after exceptions to affidavits of defendants were pleaded. The reply affidavits were in substance as follows: Ruby I. Woolf, wife of plaintiff and mother of Jackie Land Woolf, deceased, by affidavit stated her son lived with her and other members of her family in a trailer house rented by the Woolfs from Mrs. Carver; the trailer house was in Mrs Carver's trailer park located at 5721 Maple Avenue, Dallas; and "There is a creek drainage waterway which runs from a northerly direction in a southerly direction which runs through a culvert or pipe under Maple Avenue and runs across Mrs. Carver's property. Originally before this area was ever populated this stream was a natural branch. Sometime many years ago, the exact date being unknown to affiant, but long prior to August 7, 1956, a drainage system was constructed in connection with Maple Avenue and the surrounding area either by the City of Dallas or its predecessor governmental agency, and such drainage system has been maintained by the City of Dallas ever since it assumed control of said area and at least since 1945. Said drainage system is maintained to carry storm waters and surface waters from said area and especially from Maple Avenue from both directions from said culvert or pipe. That said drainage system was artificially constructed and maintained and consists of a large square pipe and which is a steep open culvert, and also two open concrete culverts or conduits on each side of said bridge or built-up area which are steep. That such artificial constructions are maintained for the purpose of catching, controlling and carrying all surface waters from all directions along Maple Avenue and carry such water at a rapid rate and greatly accelerate the normal rate of flow of such water so that a large and deep hole has eroded immediately at and under said culvert and bridge. That said hole is approximately 30 feet in circumference and approximately six feet deep.

"That said hole stays filled with water and is the place where her son, Jackie Land Woolf, who was four years of age, drowned on August 7, 1956.

"That said deep hole or pool of water in which Jackie drowned is not part of the natural waterway of Knight's Branch.

"The deep hole or pool in which Jackie drowned has not remained at its present size and depth since 1895, but has become deeper and deeper from year to year and for the last ten or twelve years has increased in size and depth because of the maintenance of said drainage system.

"The deep pool or hole is not merely a wide place in Knight's Branch but is a deep and large pool at said drainage system and it is totally unlike any other part of Knight's Branch above or below its location. That said deep pool would never have existed but for the maintenance of said drainage system and is artificially created and maintained, and no other part of Knight's Branch is even similar to said deep pool, but to the contrary the natural state of Knight's Branch above and below this condition is that of a very small and shallow branch or creek which is dry a

good deal of the time and which seldom has over one or two inches of water in it.

"That such deep pool is immediately adjacent to said bridge and culvert and under part of same and is partly on the public road of Maple Avenue and partly on Mrs. Carver's property and is surrounded on the east by a large steep hill which was artificially constructed, on the south and west by trees and same cannot be seen from said trailer park or even from Maple Avenue but is hidden from ordinary view, and I never did see this pool or know that it existed prior to the time Jackie was drowned.

"This pool could certainly be protected by any kind of fence on Mrs. Carver's property. This pool could be drained very easily by a small ditch being dug from the south end of same to allow the water to run its natural course. This pool could easily be filled to the natural level of the branch. This drainage system could be maintained in such a way as to prevent the erosion by the use of concrete or hard material bottom or splash protectors and the steep conduits could be lowered.

"Neither Mrs. Carver nor anyone else ever told me about this deep pool or warned me or my children about same, and I never knew it existed. I did know a branch was south of the trailer park and that it was practically dry all the time with only an inch or two of water in it; but I did not know this deep pool was located at the other end of Mrs. Carver's property and at the bridge and I thought the entire area was still in its natural state like it was down at the south end of her property which was a good distance away from the bridge.

"After I learned of the existence of this deep pool I can see that it is dangerous to small children and would attract them and cause them to want to play around it and my son, Jackie, was not old enough to realize the danger caused by this deep hole.

"That the sketch attached as Exhibit 'A' to the affidavit of W. H. Burke is not true and correct and does not correctly show or portray the conditions as they existed on August 7, 1956.

"That said sketch does not show the culverts above mentioned, the bridge or any other data to show the correct facts as they existed on the ground.

"That, as stated above, the deep pool is not a part of a natural stream but is an artificial structure and condition.

"Said deep pool is not located entirely on the land of Mrs. Carver. Said deep pool is located in part upon public property of the City of Dallas, Texas.

"Said deep pool was created and is maintained by said drainage system and culverts and pipes which are maintained and controlled by the City of Dallas.

"The City of Dallas owns, maintains and controls said pipes, culverts and drainage system which has and does directly cause the existence of said pool.

"The City of Dallas has control of said pool and system and has an easement on the property in connection therewith.

"That Mrs. Carver stated to affiant that the City of Dallas had control of this pool and would not allow her to fill or change same."

The two photographs of the location of creek where it went under Maple Avenue were:

The last instrument or evidence filed was the deposition of Mrs. Glen Doil Woolf, wife of plaintiff, appellant here, and mother of the deceased child. She, in substance, testified, omitting matters covered by her deposition, that her son Jackie was drowned August 7, 1956, about 7:00 A.M., the children were up then, they asked and she gave permission about 7:30 to them to go down back of the trailer where there was a 13-year old girl who also played with them and another boy; and "Well, the little boy came back about 5-minutes of 8:00 o'clock, or somewhere like that; he told me that Jackie was under the water. Naturally, I ran out; I didn't have any shoes on or anything; I had shorts and a blouse on; I ran down there barefooted; I went to the creek; I went down that little trail—there is only one trail; after I got down in this bottom, or the creek, I could see this hole of water; I went out to it; four (4) or five (5) saw me, I guess; it was in the morning about the time that they go to work; and there were people down there in a matter of seconds after I got there; I waded out in it up to where it was about to my waist; after a man got down there he made me get out— Mrs. Carver, I guess she is the one—I cannot say for sure; and he was there, I guess, about 15 or 20 minutes before we got him out; he kept wading around, trying to find him; there were tires and everything in there; so, this preacher said, he brought him across his foot, and my husband told me how they got him out." And that her son was under the water about 20 minutes; she lived at the trailer park about four years prior to August 7, 1956, and she knew from crossing the bridge there was a "low place and that water flowed under both sides of it at the time * * * she crossed it." She was not aware of the hole her son drowned in; she did not remember when she first became aware of the natural flowing creek involved here.

Mrs. Carver had never warned her about the danger of the creek or her children about going around the creek; if her husband was warned he didn't say anything about it to her; she had told her son Jackie not to go down there; Jackie was about four years, two months old at time of his death; that the warning was about three days before his death; she had then spanked him at that time; she, usually took her children with her when she left home. The only times Jackie went down there with her was when she was hanging out clothes. He was about three weeks or a month old when he first started going down to the long trailer house back of Mrs. Carver's home to visit and play with the little boy there—very shortly before the accident. She didn't know her son was in the creek before he drowned; she didn't know her son was down there until a little boy Denny came and told her her boy had fallen into the water; that was about five minutes late; the last time she saw her son alive was when he went to play with Glenda and Tana. On cross-examination by the City Attorney she testified she had spanked her son several times for going out of the yard toward the creek, told him she would spank him for going in the direction of or down to the creek; the last time she spanked her son was about three days before he was drowned. On re-direct she testified to the Wallings Trailer as nearest the creek.

The only question is whether the above deposition and evidence disclosed a prima facie cause of action sufficient to take the case to the jury on controverted material issues of fact on the matters set out in appellants' points which are favorable to appellants and would entitle them to recover compensatory damages. Such question in our opinion must be controlled by the decision of our Supreme Court in Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843, 8 A.L.R.2d 1231, which approved the rule laid down in 2 Restatement of the Law of Torts, sec. 339, as follows:

"A possessor of land is subject to liability for bodily harm to young

children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

See also Eaton v. R. B. George Investments, 152 Tex. 523, 260 S.W.2d 587 (by our Supreme Court); 8 Southwestern Law Journal 361; 27 Texas Law Review 10; 32 Texas Law Review 348; 11 Texas Bar Journal 481; 8 Southwestern Law Journal 359. The comment on the question here in 1 Southwestern Law Journal, page 108, in a comment on Eaton v. George Investments, supra, states:

"Whatever has been the law, the opinion in the instant case sounded a warning that future cases must only fulfill the four conditions set forth supra, and no attractive alluring structure need be shown as a definite element necessary to recovery, but instead, this may be proved as an evidentiary factor in the issue of foreseeability. A reasonable summary of the existing status is evident in the opinion where Mr. Justice Calvert said, 'The effect, of these late cases is to abolish as to young children the distinction between trespassers, licensees and invitees when the four conditions have been satisfied and to impose on the landowner under such circumstances a duty of ordinary care to protect them from injury.'"

The evidence here in our opinion showed without dispute that the waterway involved was a natural creek or stream formed as a natural part of such stream by forces of nature and that it had existed in its present condition, size and depth for about fifty years without change which would alter the course of the stream or the size or depth of the pool and that the pool in which the child involved here was drowned was outside the limits or boundary line of the street and was located on private property owned by Mrs. Carver some 12 feet from the city property line is conclusive, in our opinion, that there could be no liability on the part of the city and that there was no controlling material issue of fact present which would entitle appellants, if answered affimatively in their favor, to a judgment for money damages against the city.

The testimony and affidavits on file also, in our opinion, show without dispute in admissible testimony, that the pool in question, for over 50 years, has remained in the same condition without change in its course, size, or depth, etc., during that time.

Under such record the trial court did not err in its judgment against appellants, and for appellee Mrs. Carver. The judgment of the trial court should be and it is

Affirmed.

DIXON and YOUNG, JJ., concur in the judgment of affirmance.