**DEZENDORF MARBLE COMPANY,**
Appellant,

v.

**Jerry Glen GARTMAN, Appellee.**

No. 10733.

Court of Civil Appeals of Texas.

Austin.

Feb. 24, 1960.

Rehearing Denied March 16, 1960.

James R. Sloan, Looney, Clark, Mathews, Thomas & Harris, Mary Joe Carroll, Austin, for appellant.

Byrd & Davis, Austin, for appellee.

HUGHES, Justice.

Jerry Glen Gartman, age 14 years, brought this suit through his father, A. J. Gartman, as next friend against appellant, Dezendorf Marble Company, a domestic corporation, for damages for serious injuries sustained by him as a result of the explosion of a dynamite cap found on the premises of appellant in Llano County under the circumstances herein stated.

Trial to a jury culminated in a verdict for appellee. Judgment in accordance therewith was rendered for him in the sum of $63,170 plus interest and costs.

There is no contention that the judgment is excessive.

Appellant's first point is that the Trial Court erred in not holding, as a matter of law, that under the undisputed evidence, appellant breached no duty which it owed appellee.

More specifically appellant's contention is that appellee was a licensee on its premises and that the only duty which it owed him was to refrain from inflicting willful or wanton injury on him.

In determining this point we will consider the evidence in a manner most favorable to appellee and the verdict of the jury and will discard all evidence of a contrary nature.

On May 10, 1958, A. J. Gartman, father of appellee, was an employee of appellant, having been employed on May 7, 1958, as a dragline operator. He first reported for work on May 8 and worked at appellant's rock quarry on May 8 and 9. The rock quarry was located about five miles southeast of Llano, Texas. Saturday, May 10, was not a regular working day and Mr. Gartman had planned to bring his family to Llano that day in order to find a suitable place to live and to check on the cost of living. The Gartman family resided in Austin at that time.

On Friday afternoon, May 9, appellant's superintendent, Mr. Van Wigington, asked for a volunteer who would come to the quarry on Saturday, May 10, and help him with some work. Gartman volunteered to help and told Mr. Wigington that he and his family were planning to be in Llano that day anyway and that it would give him an opportunity to practice operating the dragline. Appellant's dragline operated differently from those Mr. Gartman had used

in the past and he wanted to become more familiar with it before the next working day. Mr. Wigington approved of Mr. Gartman's plans and agreed that it was a good idea. They agreed to meet at 8:00 o'clock Saturday morning at Mr. Wigington's house.

Saturday morning, May 10, Mr. Gartman and his family were late getting away from Austin and it was about noon before they arrived at appellant's quarry. Mr. Gartman had with him his wife, Bessie, and his three minor sons, Jay Quinn, age 5 years, Jimmy Len, age 8 years, and appellee, age 14 years. No one was at the quarry when they arrived.

Immediately after arriving at the quarry, Mr. Gartman went down into the pit and tried to start the dragline. However, he flooded the machine and was unable to start it. He then came back to his car but noticed that one of appellant's water pumps was running dry and getting too hot so he started toward the pump with the intention of turning it off. He never reached the pump, however, because Mr. Wigington and his wife, Bernice, arrived at that time. After introductions, Mr. Gartman helped Mr. Wigington move some of appellant's pumps from one pit to another so that the water could be drawn from the pits before the next working day. Mr. Gartman and Mr. Wigington then joined the women and children at appellant's office for a drink of water.

Since it was so late in the day, Mr. Gartman told Mr. Wigington that he and his family were going on to Llano. However, Mr. Gartman and his family did not leave because Mr. Wigington insisted that Mr. Gartman start the dragline and break up some rocks that had been blasted loose late Friday afternoon. The large rocks needed to be broken into smaller pieces so that appellant's crew could begin processing them on the next working day. Mr. Wigington helped Mr. Gartman start the dragline and Mr. Gartman broke rocks for about an hour and a half.

While Gartman was breaking rocks with the dragline, Mr. Wigington invited Mrs. Gartman and her boys to appellant's office. It was all right with Mr. Wigington for Mrs. Gartman and her boys to stay at the quarry while Gartman was working, and Mr. Wigington made no objection to their presence. Mrs. Gartman, Mrs. Wigington and the three boys went to the office upon Mr. Wigington's invitation but they did not stay inside because it was too hot. The two ladies and the three boys walked about on appellant's premises to some extent but most of the time they sat under a shade tree near an old jeep frame. Mrs. Gartman kept the children playing near her at all times.

Late in the afternoon while Jimmy Gartman, a deaf mute 8 years of age, was playing near the old jeep frame, he found laying on the ground an electric blasting cap with yellow and blue leg wires. After Jimmy had picked the cap up and crumpled the wires so that he could hold them all in his hand, he showed the wires to his mother. She just thought he had a handful of the many crumpled wires which were scattered around the premises so she told him to throw it away. This she thought he did, but instead he put it in his pocket and carried it home.

After Mr. Gartman finished his work everyone left and the Gartman family went to Llano as planned before returning to their home in Austin.

About noon the next day, May 11, while the three Gartman boys were playing with an electric train set, Jimmy for the first time showed the blasting cap to his brother, Jerry. Jerry had seen something very similar to the blasting cap in a trash can back of a radio shop near his home and he thought it was a radio part. He first connected the cap to his toy radio and later to a toy electric train transformer. The blasting cap exploded in Jerry's eyes as he turned the switch on the toy train.

Jerry Gartman received serious and permanent injuries as a result of the exploding dynamite cap.

Jerry, as stated, thought the blasting cap was a radio part. He did not know that it was dangerous to play with or that it might explode and hurt him. He knew nothing whatsoever about explosives.

Jimmy did not know the cap could hurt his brother when he gave it to him nor did he realize that it was dangerous to pick up the cap, put it in his pocket and take it home.

Harry L. Otto, who was superintendent of appellant's quarry and plant from October 15, 1955, to April 15, 1958, knew that children from 2 to 10 years of age came upon appellant's premises with their parents. These visits by families with small children sometimes occurred on weekends. He also stated that one family with two children from 5 to 6 years of age lived on the premises in a room located only about 60 feet from the old jeep frame where the blasting cap was found. Some times the wives of employees would bring small children along with them when they came after their husbands in the afternoon. They usually parked around the old jeep frame and sometimes permitted the children to play nearby. Mr. Otto brought one family with a four year old child to the quarry.

For a while bus loads of students came upon appellant's premises about every two weeks and would inspect and study rock formations. Mr. Otto had no objection and made no objection to families, small children or students coming upon appellant's premises at any time so long as they did not interfere with appellant's work.

Flay Bird, who has lived within sight of appellant's quarry for about fourteen years, testified that families with small children have been visiting the quarry for many years.

John W. Herridge, appellant's employee for the past 3½ years, had also seen small children walking about on appellant's premises. In fact, he personally escorted a group of cub scouts on a tour of the whole quarry. He also remembered the family with two young children that lived on the premises. His own children are 6 and 12 years of age and his wife has brought them to the quarry on occasions.

Lester Smathers, appellant's employee for the past year and a half, had likewise seen small children on appellant's premises. He also remembered the family with small children that lived on the premises near the old jeep, and he had seen students examining the rock formations in appellant's quarry.

Appellee's counterpoint to this first point is that "Appellant owed the highest degree of care to children who it had reason to believe might be upon its premises even as trespassers." Arguing this position he says: "No more can the cry of 'no duty' be raised to deny a recovery to a child seriously injured by the negligence of an occupier of land if the child's presence could have reasonably been foreseen. Eaton v. R. B. George Investments, 152 Tex. 523, 260 S.W.2d 587 (1953); Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843 [8 A.L.R.2d 1231] (1948). The multitude of cases cited by appellant to the contrary are either clearly distinguishable or have been overruled by the above decisions. Appellees will not waste the time of this Court in discussing appellant's outmoded citations."

We agree with appellee that the cases named by him are controlling on this feature of the case and since the Court in Eaton [152 Tex. 523, 260 S.W.2d 590] stated: "No good purpose would be served by a review of the decisions on the subject rendered by our courts prior to the Banker decision" that it would be useless, as well as improper, for us to do so.

We copy from Eaton the law which must be applied by us in this case:

"Whatever may have been the rule in this state prior to the Banker deci-

sion, it is now clear that a landowner cannot escape liability for bodily harm to trespassing children caused by a structure or other artificial condition maintained on his land by simply establishing that such structure or other artificial condition was not unusually attractive to children. In the Banker case this court approved and adopted the rule laid down in Volume 2, p. 920, Sec. 339, of the Restatement of the Law of Torts wherein it is said: 'A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

" '(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

" '(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

" '(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

" '(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.'

"See also Prosser on Torts, Sec. 77, pp. 620–625.

"In the Restatement comment on Clause (a) above it is said: 'It is not necessary that the defendant should know that the condition which he maintains upon his land is likely to attract the trespasses of children or that the children's trespasses shall be due to the attractiveness of the condition.'

Just so also this court said in the Banker case that 'The element of attraction is important only in so far as it may mean that the presence of children was to be anticipated'; and again: 'It is of course immaterial also whether the dangerous condition be in close proximity to a path or highway, as is held in some cases, since that fact merely bears on whether the presence there of members of the public is reasonably to be anticipated. Whether the dangerous condition is an "attractive nuisance" is also merely a circumstance bearing on the same question'; and again, quoting from Prosser on Torts, 1941, p. 619: ' "The better authorities now agree that the elements of 'attraction' is important only in so far as it may mean that the trespass is to be anticipated, and that the basis of liability is merely the foreseeability of harm to the child" '; and again: 'nor is it important for what purpose a person (impliedly invited) enters premises on which a dangerous condition is maintained, provided his presence there is reasonably anticipated. Nor is it important for the same reason, whether the dangerous condition is visible from traveled ways.' * * *

"The effect of these late cases is to abolish as to young children the distinction between trespassers, licensees and invitees when the four conditions have been satisfied and to impose on the landowners under such circumstances a duty of ordinary care to protect them from injury."

Pertinent findings of the jury on this phase of the case are:

"(1) Appellant knew, or, by the exercise of ordinary care, should have known that young children were likely to be present upon its premises.

"(2) Jimmy Gartman found the blasting cap on appellant's premises.

"(3) The cap belonged to appellant.

"(4) Jimmy Gartman did not realize the risk involved in picking up and taking home the cap.

"(5) Jerry Gartman did not realize the risk involved in connecting the cap to an electric current.

"(6) A. J. Gartman and his wife took their children to appellant's quarry as the result of a free choice, but neither A. J. Gartman nor his wife knew or should have known that their children might come into possession of a dynamite cap.

"(7) Jerry Gartman did not know, and in the exercise of ordinary care, should not have known of the danger involved in connecting the cap to an electric current.

"(8) Jerry Gartman did not understand or appreciate the danger involved in connecting the cap to an electric current under the circumstances of this case."

Requirement (a) of the Eaton case, set out supra, is fully sustained by the evidence and jury finding above set out. We will not, at this juncture, discuss the word "condition" as used in requirement (a).

Appellant under requirement (a) cites and argues the effect of the decisions in Taylor v. Fort Worth Poultry & Egg Co., Tex.Civ.App., Fort Worth, 112 S.W.2d 292, writ dismissed and Blossom Oil & Cotton Co. v. Poteet, 104 Tex. 230, 136 S.W. 432, 35 L.R.A.,N.S., 449. These cases hold that where a child is accompanied by parents or other custodian there is no duty on the part of a proprietor of dangerous premises to exercise care to prevent its injury.

These cases are before Eaton and the rule they stand for is not brought forward in the requirements there stated.

█ The fact that children are accompanied by their parents or other custodian is relevant, we believe, on issues of negligence, i. e. the exercise of that degree of care required by the circumstances of the case, but in no event should such fact constitute an absolute defense. This case affords an excellent example of the unsoundness of the rule of the cases cited. The dynamite cap, a harmless looking device to the uninformed, might have exploded at any time and from various causes, hereinafter mentioned, wholly unrelated to the presence of parents or their ability to prevent it. The presence of parents as an absolute defense under such circumstances is unrealistic and one which is not and should not be recognized.

Requirement (b) refers to the condition maintained on the premises, the proprietor's legal knowledge of it and its dangerous nature.

The jury finding that the dynamite cap was found on the premises of appellant and that it belonged to appellant is supported by the evidence and we do not understand appellant to dispute the sufficiency of the evidence to sustain this finding.

Appellant's business was quarrying rock. In this business blasting by dynamite or other explosives is essential and in which the use of dynamite caps is utilized. The evidence, more fully related under discussion of the negligence issues, shows that these caps are carried from the magazine to the holes in which dynamite has been placed and that as many as 40 holes are detonated at the same time. Sometimes there are misfires, by which is meant that all caps or dynamite are not exploded. Search of the premises is made for unexploded caps. It is true that the evidence shows no unexploded cap had ever been found but the nature of the blasting operation and the fact that search for unexploded caps was made is evidence that the business was a hazardous one and that the premises on which the business was conducted were dangerous. Knowledge of these facts was necessarily possessed by appellant.

As to requirement (c) both Gartman boys testified that they did not know the found

cap was dangerous, appellee testifying that he thought it was a radio part. Appellant does not contest the sufficiency of the evidence to support the jury findings on these issues but it "respectfully urges that the undisputed evidence that 8-year Jimmy Gartman willfully disregarded the warnings of his father and mother of the dangers at the quarry and that they (the children) were not to pick up anything and carry it away and that he willfully disobeyed his mother's direct instruction to throw the cap away when she saw him with it in his hand, precludes a finding that he did not realize the risk involved in his picking the dynamite cap up and carrying it away from the quarry as a matter of law."

Further quoting appellant, he says: "The injured plaintiff, Jerry Gartman, was 14 years old_and there is no evidence that he did not have average or above average intelligence, experience and judgment for a 14-year old boy. As a matter of law he must be charged with knowledge that he might be electrocuted, seriously burned or otherwise severely injured by connecting the wires to an unknown device to the electric current in his home."

In support of this position appellant quotes the following from Massie v. Copeland, 149 Tex. 319, 233 S.W.2d 449:

"A normal fourteen-year-old boy is of high school age. He is well advanced in Boy Scout activities if a member of that organization. If not a member of it, he nevertheless has spent time enough in the outdoors to understand its attractions and its dangers. Some of our statutes recognize the maturity and discretion of fourteen year old children. A minor may select his own guardian when he is fourteen years of age. Article 4126, Revised Civil Statutes of 1925. A fourteen year old child, after hearing before the county judge or after passing an approved standard driver training course, may obtain a driver's license permitting him to engage in

the serious and dangerous practice of operating an automobile on the public highways and city streets. Subdivision 1, Sec. 4, Art. 6687b, Vernon's Annotated Civil Statutes.'

"The court then stated the following:

" 'Prosser, after stating that the doctrine "does not apply to children of sufficient age and mental capacity to be competent under the circumstances to look after themselves". says further that "in practice it is seldom that children above the age of 12 have been protected." He adds that *"there are a few cases, where unusual and highly deceptive instrumentalities were present, in which children of an age between twelve and sixteen have been permitted to recover."* Prosser on Torts, pp. 623–624, Sec. 77. A like statement appears in Corpus Juris Secundum: "While there is no definite age fixed at which a child ceases to be entitled to the protection of the attractive nuisance doctrine, the great majority of cases in which it has been applied have involved children of less than ten years of age, and it has been considered that it cannot be applied to a child of the age of fourteen or over, at least in the absence of some showing of a lack of the mental development which is ordinarily found in children of that age or of a very exceptional state of facts." Vol. 65, Negligence, § 29(11), p. 469.' (Italics ours.)

"The court further stated as follows:

" '* * * We believe that this question is usually regarded in attractive nuisance cases as a question of law for the court's decision. It has been so treated in the Banker case and in the Stimpson case, discussed above. The court determines whether the child is of such tender years and immaturity that the protection of the doctrine as against the particular condition or danger should be extended to him. This

is a part of the court's decision that the property owner or possessor owes or does not owe a duty to the child. * * *' "

In this case the Court held a 14-year old boy who drowned in a pit partially filled with water did not come within the rule of the Banker case.

■ We hold that the discretion allowed the Trial Judge in determining whether a person is to be regarded as a child or an adult in cases of this character was not abused in this instance. We base this decision on the ground that "highly deceptive instrumentalities were present," in the form of a harmless looking small brass cylinder to which was attached a blue and yellow wire a foot or so long.

Requirement (d) does not seem to fit squarely into the fact situation here presented. This is a difficulty always encountered when a general rule is made to cover a multitude of dissimilar factual conditions.

As we have stated, dynamiting and the use of dynamite caps was essential to appellant's business. It is not this utility, as we understand it, of which the rule speaks, rather it is the utility of the dangerous condition. The maintenance of premises made dangerous by the presence of dynamite caps on it would be of small utility to anyone. The risk involved is obvious and tragically demonstrated here.

The two cases cited by appellant decided subsequent to the Banker and Eaton cases on the liability of a landowner to minor children are Gonzalez v. Broussard, Tex.Civ.App., San Antonio, 274 S.W.2d 737, writ ref., N.R.E., and Chekanski v. Texas & N. O. Ry. Co., Tex.Civ.App., Houston, 306 S.W.2d 935, writ ref., N.R.E. They deserve discussion.

In Gonzalez a judgment in favor of a small boy was reversed and rendered. The boy was injured when he stumbled over a rock on a playground provided at the owner's drive-in theatre. The decision does not mention either the Banker or Eaton cases and cites no authorities subsequent to those cases. The soundness of the decision, however, is unquestioned. There the child was, by his own testimony, shown to have had full knowledge and appreciation of the dangers incident to playing among the rocks.

In Chekanski the injured person was an adult which so distinguishes it that further discussion is not proper.

■ We have considered appellant's first point with as much care as we are capable of and have concluded that it should be and is overruled.

Appellant's Points 2 through 5 are that there is no evidence or insufficient evidence to support jury findings that (a) Jake Gonzales or his helper carried dynamite caps in their pockets, (b) the facts found in (a) were a proximate cause of the explosion, (c) appellant failed to adequately inspect the premises, that this was negligence and a proximate cause of the explosion, (d) appellant failed to maintain proper custody and control of the dynamite cap and that this was a proximate cause of the explosion.

Point 6 specifically denies that the element of foreseeability was present in the acts found by the jury to constitute negligence.

It is our opinion that points 2 through 6 should be overruled. We will, in the interest of brevity, consider them together and set out the evidence which we believe sustains the jury findings from a no evidence standpoint as well as the evidence as a whole from which the preponderance of the evidence rule may be applied, in one statement.

Jake Gonzales, the dynamite man for and employee of appellant, testified:

"Q. You have carried them in your pockets, haven't you? A. No, sir.

"Q. Are you going to testify that you have never carried dynamite caps in your pockets, Gonzales? A. Yes, sir, I can testify that I never did.

"Q. And, to the best of your knowledge, none of your helpers have ever carried dynamite caps in their pockets? A. No, sir. * * *

"Q. * * * you will admit, will you not, sir, that it is just the most dangerous thing you can think of to carry a dynamite cap in your pocket? A. I know that. That is the reason I don't carry them in my pocket, because I do not want to kill myself."

There was also testimony from other employees or officers of appellant that Gonzales was the only person to handle the dynamite and that he was instructed to carry the caps in a box and not on his person.

Mr. Harry Otto, a former employee of appellant and its witness, testified:

"Q. * * * have you ever seen the dynamite man and his helpers carrying blasting caps on their person? A. Coming from the magazine to the hole, I have.

"Q. If I understand you correctly, you have seen them carrying blasting caps from the magazine to the hole? A. That's right.

"Q. How were they carried? A. Well, on their person, why, if it was just one or two caps that was in their hand. If there was more than that many, usually in a box, sometimes in their pockets.

"Q. Have you seen them carrying them in their pockets? A. I have.

"Q. And how did you notice that these blasting caps were being carried in the dynamite man's pocket?

"A. Well, they are long, the wires usually stuck out of the pocket.

"Q. Did you see the wires sticking out of the pockets on those occasions? A. Yes.

"Q. The wires, now, to the blasting caps? A. Wires to the caps.

* * * * * *

"Q. All right, sir. Now, the testimony has been introduced here in evidence this morning by deposition to the effect that you have seen Jake Gonzales with blasting caps in his pockets. What are the facts in that regard, Mr. Otto? A. Well, I am sure that I—they were caps. * *

"Q. On the few occasions that you have testified about. Of course, could you see, actually see the caps? A. No, not actually the cap part. The wire part is what I saw."

Jake Gonzales explained that sometimes extra wire was needed to connect a series of holes for a single blast by an electric charge and:

"Well, I cut some of them off of a cap one time you know, here not long ago, because we didn't have any connecting wire that day."

Questioned further with regard to the same practice, Gonzales testified:

"Q. And I simply ask you whether or not from time to time in the past you have taken new cap wire and used that for tying your connections together? A. Yes, sir.

"Q. And where do you normally carry that cap wire? A. Cap wire?

"Q. Not the cap wire, but the connecting wire that you— A. Sometimes I carry it in my pockets, you know, connecting wire.

"Q. Sometimes you carry it in your pockets? A. Yes, sir.

"Q. Now, what do you normally use to carry your caps in to the hole? A. A box.

"Q. Do you sometimes carry your connecting wire in a box? A. No.

"Q. You do not? A. No."

Harry Otto gave this further testimony:

"Q. Well, I will ask you if it possible that if Jake Gonzales needed some extra connecting wires, that he could have clipped the wire off here and used a bundle of this wire for connection purposes? A. Well, he did do that some.

"Q. All right. A. When we needed connecting wire."

There is also evidence that the cap and wire found by Jimmy Gartman was not a new cap because wires were not shunted (fastened together with a lead device for grounding purposes) as new caps were and there is no evidence that in carrying caps from the magazine to the hole the dynamite man would stop to eat lunch under the tree where the cap was found and which is a considerable distance from the blasting area. There is evidence, however, as testified to by Mr. Otto that:

"Q. Ordinarily, how many different holes would you blast at one time, sir? A. Well, usually, it was about eight to ten. It would run from three to sometimes 40 or 50 holes.

"Q. And if you blasted 40 or 50 holes at one time, how many electric blasting caps would that require? A. Usually 40 or 50—one for each hole.

\* \* \* \* \* \*

"Q. On those occasions that you have told me about, Mr. Otto, you would prepare the hole for blasting —that is, prepare it inasmuch as you put the dynamite in and then wait until after the lunch hour and come back and set off the actual blast—what did your employees, Jake Gonzales, the dynamite man, and his helpers do during the lunch hour? A. They ate their lunch.

"Q. Where would they eat it, sir? A. Most of the time around the big tree during the Summer. During the Winter, inside the shack.

"Q. What big tree are you referring to? A. Where the old jeep was.

"Q. Where the old jeep frame is sitting now? A. That's right."

A. J. Gartman, father of the injured boy, testified that during the period when he was working for the appellant company he observed no deviation from established practices in common use in the handling of explosives. He specifically stated that he never at any time saw any blasting caps laying around loose on the premises.

Jake Gonzales, appellant's employee in charge of blasting, testified in detail as to the care with which explosives were handled before the charges were set off and to the diligent inspection made thereafter. He further explained how the premises are policed, even to the extent of picking up fragments of wires left after a blast.

Harry L. Otto, a former employee of appellant, similarly testified to the careful inspection made of the premises and specifically testified that, "We always found all of the caps" after a blast. He explained that it was normal practice to police the area and to be on the lookout for danger any time a wire was seen on the ground.

Jerry Glen Gartman, the injured boy, testified that during the time he was at the plant with his parents and brothers he saw no wires like those attached to the cylinder, the dynamite cap, which his younger brother gave him on the following day.

Samuel C. Bilbrough, President of appellant, explained how all employees were instructed to pick up all wires and to check for any possibility of danger. He specifically stated that he had never found and that no one had ever reported to him the finding of a loose dynamite cap on the premises.

Dick Patton, a former employee of appellant, testified that at no time when he was working for or around the plant of the marble company did he ever see any loose dynamite caps around the premises. The testimony of John W. Herridge was similar. He had never at any time seen loose dynamite caps unguarded on the premises of the plant.

For several days before the Saturday on which the cap was found, Herridge had worked on and around the discarded jeep which had been left under the tree where Jimmy Len said he picked up the wires. He testified that he saw no cap, that he worked on that side of the jeep, and that he would have seen the cap had it been there.

Jack Carson, another employee, explained that he also had been in the precise area where the younger Gartman child testified that he had picked up the dynamite cap only a short time before May 9. He had made an examination of the area and was confident that the cap could not have been at that location when he was there.

It is also shown that a blast occurred Friday afternoon, the day before the dynamite cap was found by Jimmy Gartman and that Saturday is not a normal working day at the quarry. This evidence tenders the possibility that through a misfire in the Friday afternoon blast the found cap was hurled to where it was picked up by Jimmy.

It was in evidence, too, that it is the custom in the Central Texas area for quarries to keep a written record of all dynamite caps that are deposited in the magazine, of all caps that are checked out from the magazine each day and of all caps returned to the magazine at the end of the day. One of the reasons for this custom is to protect against lost or misplaced caps. Jake Gonzales knew about this custom yet neither he nor anyone else kept any type of record at appellant's quarry. Mr. Wigington, the superintendent who took Harry Otto's job on April 15, 1958, also realized that records should be kept.

The evidence shows that if a dynamite cap is lost or misplaced and the leg wires are loose, it can be exploded by static electricity from a sandstorm, by electricity from a transformer nearby, by a two way radio in an automobile, by electricity from an airplane, by electricity created by rubbing movements of the human body, by ordinary shock and by other causes. Jake Gonzales knew these things and realized that a dynamite cap is dangerous even to adults if it is left out on the ground. He also realized that any normal child would be attracted to and enticed into handling a dynamite cap if one is left laying on the ground.

The evidence also shows that misfires are common and after each shot a thorough check should be made to make sure all holes exploded. If any wires are protruding from the ground so as to indicate that there may have been a misfire, a galvanometer should be connected to the end of the loose wire in order to determine whether the cap and dynamite underneath exploded. There had been misfires at appellant's quarry but Jake Gonzales had never used the galvanometer. He just inspected the holes visually. No inspection was ever made of appellant's premises except by Jake Gonzales and he admitted that he never made a general inspection of the premises near where a series of caps had been exploded.

Samuel C. Bilbrough, President of appellant corporation, agreed that to leave dynamite caps laying on the ground is unexcusably careless and invites disaster.

No one did any blasting or used any electric dynamite caps on appellant's premises except persons who were acting for and on behalf of appellant and the found cap was of a type used by appellant.

■ The Trial Court in its charge to the jury defined negligence, as applied to appellant, in this language:

"As a possessor or user of dynamite caps, the defendant, and its employees entrusted with the care and control of dynamite caps, were under a duty to exercise such a high degree of

foresight as to possible dangers, and such a high degree of prudence in guarding against them, as would be used by a very cautious, prudent and competent person under the same or similar circumstances. 'Negligence,' as applied to defendant, means a failure, if any, to exercise this high degree of care."

No objection to such charge is brought forward by appellant. Its correctness is attested by our decision in Atex Construction Co. v. Farrow, Tex.Civ.App., Austin, 71 S.W.2d 323, writ ref.

■ When we view the evidence, as the jury did, with the Trial Court's definition of negligence before us, we cannot escape the conclusion that the findings of the jury under discussion were well within their discretionary power.

The failure to keep records of the dynamite caps issued to its employees by appellant left to the frailty of human memory their accountability and from this evidence and the evidence that dynamite caps were carried on the person of employees it did not stretch the rule of reason for the jury to infer and conclude that the cap in question could have been lost by such employee. The place where the cap was found being a place where these employees frequently ate their lunch is highly corroborative of this finding.

More clearly still is the jury finding that appellant's inspection of the premises was inadequate. To the found cap were attached colorful wires of easy visibility. If *any* search of the spot where the cap was found had been made following the blasts on the day preceding such finding it seems almost incredible that this cap and wires would not have been found. Then, too, if the premises were subjected to inspection this area where people congregated to eat and rest should have been the one place where inspection should not have been casual. A thorough inspection would certainly have revealed the cap. There is no evidence that the found cap could have come to its finding place except in one or the other of the ways indicated.[1]

■ The issue of foreseeability has also, in our opinion, been logically and correctly found by the jury within its discretionary sphere. The presence of children on the premises was to be anticipated and the dangers incident to the careless handling of explosives were not only known to appellant but are matters of common knowledge. The curiosity and inquisitiveness of children is also a matter of common knowledge and appellant was bound to foresee that this childish trait when applied to experimentation with a dynamite cap might result in injuries to the child so engaged.

Appellant's last point is that the uncontradicted evidence shows that the injuries to appellee were the direct and proximate result of the negligence of a person or persons other than the employees of appellant.

The jury answered that the act of Jimmy Len Gartman in disobeying his mother's instructions to throw away the dynamite cap was not the sole proximate cause of the explosion, and similarly that the acts of Jimmy Len Gartman in disobeying the warnings and instructions of his parents not to pick up anything at appellant's quarry and in bringing the dynamite cap from the quarry to his home in Austin was not the sole proximate cause of the explosion.

We believe the question of "sole proximate cause" is settled against appellant by the case of Natatorium Laundry Co. v. Saylors, Tex.Civ.App., Fort Worth, 131 S.W.2d 790, writ dism. c. j.

1. Appellant in its brief states:
   "The only reasonable or logical explanation for the presence of an unexploded but unshucked, unshunted cap with shortened wires in the place where Jimmy Len Gartman said that he found the cap in question is that it had been attached in circuit, failed to receive a sufficient charge to explode, but had been by the force of the explosion of the other caps and the dynamite, hurled as a missile out of the pit or quarry."

In Natatorium the Court sustained a jury finding that the act of a small boy in throwing naptha on a fire when he knew its flammable nature was not the sole proximate cause of injuries sustained by ten year old Charles Saylor who had obtained the naptha from the defendant, some of which spilled on his (Saylor's) clothes. The negligence of defendant in storing the naptha in a place accessible to the boys and the negligence of the boy who threw the naptha on the fire were held to be concurring acts of negligence.

█ We hold that a jury question was presented on the issue of sole proximate cause and the jury's resolution of this issue is sustained by the evidence.

Our rulings on all evidentiary assignments are that the answers of the jury to all issues are supported by evidence of probative force and that none is against the overwhelming preponderance of the evidence so as to be clearly wrong.

The judgment of the Trial Court is affirmed.