V. W. KELLEY et al., Appellants,

v.

BRAZOS VALLEY COTTON OIL MILL,
INC., et al., Appellees.

No. 3974.

Court of Civil Appeals of Texas.

Waco.

March 22, 1962.

W. L. Tandy, Waco, for appellants.

Naman, Howell, Smith & Chase, Cullen Smith, Louis Muldrow, Waco, for appellees.

WILSON, Justice.

The court granted defendant's motion for instructed verdict in an action for death of a boy 14¼ years of age, who was killed by stepping into a cotton seed conveyor auger inside a storage tank on defendant's premises.

This is said to be an "attractive nuisance" case but turns, primarily, on whether there is evidence defendant breached any duty it owed to deceased, and whether the issue of foreseeability is raised. The conditions to be satisfied to establish liability in the usual case of this type are: "(a) the place where the condition was maintained was one upon which the possessor knew or should have known that small children would likely frequent the place and play about it; (b) the condition was one of which the possessor knew, or should have known, involved an unreasonable risk of death or serious bodily harm to such children"; (c) the child, because of its tender years, did not realize the risk involved in encountering the instrumentality causing injury; and (d) the utility of eliminating

the danger was slight as compared to probability of injury. Massie v. Copeland, 149 Tex. 319, 233 S.W.2d 449, 451; Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843, 847, 8 A.L.R.2d 1231. See Eaton v. R. B. George Investments, 152 Tex. 523, 260 S.W. 2d 587.

Defendant operates a cotton seed processing plant extending over a city block adjacent to railroad tracks near the central business district of Waco. Its premises are entirely enclosed in a metal "cyclone" fence. The plant consists of several buildings, and the dominant structures are two massive metal seed storage tanks, much larger than the surrounding buildings. These tanks are each complete enclosures containing seed to be processed. Through the entire interior diameter of each there is a metal tunnel six feet in height and width, through the sloping sides of which cotton seed are permitted to fall in quantities required. The seed drop into a metal trough set in the tunnel floor which contains a conveyor auger of 12-inch diameter, extending the length of the lighted tunnel. The revolving auger transports seed from the storage tanks to processing equipment in other buildings. It is in operation 24 hours a day. The conveyor and the extensive machinery in the tank which propels it makes a constant "loud, roaring noise".

The machinery is entirely enclosed by the steel walls of the tank which may only be entered from the outside by climbing through a "porthole" or manhole 24 inches wide, "several feet or less" above the ground, through which cotton seed is sucked into the tank from railway cars or trucks. There is a front entrance gate to the plant from the office, and a rear gate for loading and unloading rail cars and trucks, in the fence surrounding the plant, which are usually left unlocked. All other gates are kept locked. "No admittance" and warning signs are placed about the plant.

Six weeks before the tragic occurrence, deceased was seen in the plant area near a loading dock. An employee told him it was dangerous to be around the plant and instructed him to leave. Deceased replied, "You can't make me." The employee thereupon called the assistant plant superintendent who required him to leave the premises.

On the day of the accident, defendant's Negro employee working in a hull house saw deceased near one of the tanks about 11:30 A.M. The boy had picked up a pair of workmen's dust goggles, tried them on, and placed them in his pocket. The employee instructed him to put the goggles down, "and leave out; and he done just what I told him", leaving the premises by the front gate.

Some time before noon another Negro employee saw deceased near the rear of the plant area at a seed house. He told deceased, "Boy, no messing around in here; it's too dangerous. You will have to go out that gate there. It's too dangerous in here and you will get hurt." All gates were then locked, he testified, except the front entrance gate toward which he directed the boy. Deceased replied, "O. K.", and the employee returned to his work. Shortly thereafter this workman left the seed house to go to lunch. As he passed the two storage tanks he saw deceased "going between them." He immediately "rushed" to the office to notify the plant superintendent, because "a white boy and a colored guy like that, it's better to go to somebody that's white and let them handle it." The superintendent came promptly, "running to the front" of the dock area, but by the time he reached the tanks the boy was dead; his mutilated body lying inside the tank, in the tunnel, across or near an open segment of the conveyor-auger housing from which a portion of the cover was removed. The body was six to ten feet from the manhole. The auger was apparently covered and obscured by cotton seed. The accident occurred approximately at noon. Only two men ever worked in the tunnel: the employee who had reported to his superior, and his relief employee who had just returned from lunch and was then working

in another area of the plant. The evidence does not show any child had ever previously been known to enter one of the tanks.

■ Appellants say the noises of machinery operating throughout defendant's plant and the aroma of cooking cotton seed products made defendant's premises attractive to trespassing children so as to make the plant area an attractive nuisance. In this case that factor becomes immaterial as to the premises, for it "is important only in so far as it may mean the presence of children was to be anticipated." It was already known that this boy had actually come upon the premises. If attractiveness is an element, it applies here primarily to the instrumentality or condition which caused the injury, and is material on the issue of anticipation of consequences by defendant. The instrumentality or condition, in this case, is an auger enclosed in a housing, enclosed in a steel tunnel, enclosed in a plated tank, with the restricted means of ingress described. To warrant recovery it was necessary to show "that the injury was caused by the negligence of the owner or occupant after the presence of the trespassing child upon the premises was known to him." Eaton v. R. B. George Investments, 152 Tex. 523, 260 S.W.2d 587, 590.

■ May it reasonably be said that defendant could have reasonably anticipated that a 14-year-old boy, having been specifically admonished that the plant area was dangerous and he might get hurt, and having complied with orders to leave the fenced premises would shortly thereafter climb up to, and crawl though a two-foot hole in a steel enclosure, enter a tunnel and step on the auger? If so, could reasonable minds differ as to whether, having twice evicted him from its premises and warned him of possibility of injury from dangerous machinery dispersed over the area of a city block, defendant could have reasonably anticipated this tunnel of difficult access would be selected from all the dangerous mechanisms in the entire plant? Should defendant have known its almost inapproachable and secluded conveyor, walled in so as to impede approach, involved an "unreasonable risk of injury" to deceased? Did defendant breach a duty to deceased in removing the bolted plates from the manhole and leaving it uncovered when its continued unobstructed use was necessary as a matter of utility in defendant's operations? We do not believe defendant was required to make the tank impregnable and impenetrable to entrance. It is said defendant should have kept all fence gates locked. The evident agility and persistence of the boy could not have been thereby effectively suppressed, under the undisputed evidence. He could have climbed the fence. It is said the Negro employee was negligent in directing him to walk nearly a block to the front entrance instead of taking him to the more accessible rear gate. There was evidence the latter gate was locked, but six weeks previously deceased voluntarily used the front gate as an exit. The boy having again agreed to leave by the front gate on the present occasion, it would seem the employee would not incur liability of his employer in failing to anticipate he would remain on the premises. We do not believe defendant can be charged with liability for the conduct of the Negro employee who, having unsuccessfully sought to induce deceased to absent himself from the property, rushed to summon his superior as "a white man, to handle a white boy", when the superior ran to the area in response.

In our opinion the evidence does not raise an issue of a breach of duty to deceased.

Appellants urge the trial court erred in concluding further that deceased was not of such tender years, inexperience and capacity as to be unable to understand and appreciate the dangers and risk confronting him. Although, under our view of the case, it is not essential to pass on the question, we think the undisputed evidence establishes the conclusion is a proper additional basis for the judgment.

In Massie v. Copeland, 149 Tex. 319, 233 S.W.2d 449, 452, 453, it was held that "the

protection of the attractive nuisance doctrine is not to be extended to a normal boy fourteen years of age" in a case involving swimming in an open pit, and that " 'in the very nature of things' he was capable of understanding and appreciating the dangers." The Supreme Court cited authorities to the effect that although, where highly deceptive instrumentalities exist, a few cases have permitted recovery for injury to children between six and twelve years of age, "it is seldom that children above the age of 12 have been protected", and "the great majority of cases in which it has been applied have involved children of less than ten years of age, and it has been considered that it cannot be applied to a child of the age of fourteen or over, at least in the absence of some showing of a lack of the mental development which is ordinarily found in children of that age or of a very exceptional state of facts." The court held that consideration must be given "both to the character of the danger" and to age and maturity of the child.

 To meet implications of this decision, appellants introduced the school records of deceased, which showed he was failing most subjects in the seventh grade, and that "mental maturity" and achievement tests based on "word meaning", sentence and paragraph comprehension, information, matching, number concept, copying, analogy, vocabulary and similar factors, showed the "mental age" of deceased was from 1 year and 9 months to 2 years and 7 months less than his chronological age. The evidence established, however, that deceased attended school less than half of the regular school days during the year before his death. He had an intelligence quotient of from 78 to 86, and a non-language I. Q. of 94. Appellant, the mother of deceased, testified he was "a boy of average intelligence." Without detailing the unfortunate environment and parental background in which the boy was reared, it may be characterized as somewhat less than auspicious. The undisputed evidence establishes that the boy could not be expected to have the

educational attainments of an average child his age or to pass his school work, by attending less than half the time, and by existing under the conditions surrounding his upbringing. The school superintendent, plaintiff's witness, testified, "if he is not present, he can't learn from school." These facts, when the record is considered most favorably to appellants under familiar rules, do not raise the issue that deceased was not of such years and discretion to fully understand, appreciate and realize the risk involved, where he had been specifically apprised of such risk, and, as the evidence shows, had repeatedly attempted to evade and elude defendant's employees who evicted him from the property. Other contentions have been considered and are overruled.

The judgment is affirmed.