Charles W. ROBERTSON et ux., Appellants,

v.

CENTENNIAL PROPERTIES OF AUSTIN, INC., et al., Appellees.

No. 11315.

Court of Civil Appeals of Texas.

Austin.

June 23, 1965.

Rehearing Denied July 14, 1965.

John S. Wade, Austin, for appellants.

Brown, Sparks & Erwin, Jack Sparks, Austin, for appellees.

HUGHES, Justice.

This suit was by Charles W. Robertson and wife, Barbara J. Robinson, against Centennial Properties of Austin, Inc., A. P. Dooley, R. E. Eggling, E. W. Jackson, Sr., E. B. Moody, R. H. Porter and W. L. Thompson, to recover damages occasioned by the death of their son, Larry Charles Robertson, then aged eight years and one month, who on March 25, 1963, drowned in a pond located on property owned by defendants.

Trial was to a jury and, after plaintiffs rested their case, defendants made motions for an instructed verdict in their behalf which the trial court granted and rendered judgment accordingly.

We will, in determining the propriety of the instructed verdict, view the evidence in the light most favorable to appellants. We will indulge against the instruction every inference that may properly be drawn from the evidence. And, if the record reflects any testimony of probative force, either direct or circumstantial, in favor of appellants, we will hold the instruction improper. White v. White, 141 Tex. 328, 172 S.W.2d 295, and cases therein cited. We will also discard all testimony adverse to appellants. Texas Employers' Ins. Association v. Humphrey, Tex.Civ.App., 140 S.W.2d 313, Amarillo, writ ref.

Bearing in mind these rules, we have concluded to state and discuss the facts favorable to appellants separately as they relate to each of the elements essential to the cause of action pleaded by appellants. They allege as follows:

"Defendants were on March 25, 1963, the owners of a tract of land north of Steck Avenue and west of Franwood Street on the northwest edge of Austin, Texas, said tract of land being more specifically described in volume 2572, page 582 of the Travis County Deed Records. On said tract of land there is a man-made waterhole which is approximately a quarter mile from Franwood Street which is in a community with many small children.

IV.

Centennial Development Company of Austin purchased an interest in the above mentioned tract of land on January 15th, 1963, and at that time, it was apparent that the town had extended over into the area near the waterhole and was apparent that small children were playing around the waterhole. Defendants knew or should have known that the waterhole was an attractive nuisance and that there was a good possibility that some child would drown in said waterhole.

V.

On March 25th, 1963 Plaintiff's deceased son, Larry Charles Robertson, age eight years was playing with other children around said waterhole when his foot slipped on a slippery rock and he fell into the waterhole and drowned, as a result of defendants' failure to eliminate said nuisance, or put an adequate fence around same."

With respect to these allegations we quote from the case of Eaton v. R. B. George Investments, 152 Tex. 523, 260 S.W.2d 587, the legal requirements relative thereto:

"We have set out the procedural developments in the various stages of

the case because we are convinced that they demonstrate that the parties to the cause and the courts below have failed to appreciate and evaluate fully the opinion of this court in the case of Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843, 847, 8 A.L.R.2d 1231. Whatever may have been the rule in this state prior to the Banker decision, it is now clear that a landowner cannot escape liability for bodily harm to trespassing children caused by a structure or other artificial condition maintained on his land by simply establishing that such structure or other artificial condition was not unusually attractive to children. In the Banker case this court approved and adopted the rule laid down in Volume 2, p. 920, Sec. 339 of the Restatement of the Law of Torts wherein it is said:

'A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.'

See also Prosser on Torts, Sec. 77, pp. 620–625.

[2] In the Restatement comment on Clause (a) above it is said: 'It is not necessary that the defendant should know that the condition which he maintains upon his land is likely to attract the trespasses of children or that the children's trespasses shall be due to the attractiveness of the condition.' Just so also this court said in the Banker case that 'The element of attraction is important only in so far as it may mean that the presence of children was to be anticipated'; and again: 'It is of course immaterial also whether the dangerous condition be in close proximity to a path or highway, as is held in some cases, since that fact merely bears on whether the presence there of members of the public is reasonably to be anticipated. Whether the dangerous condition is an "attractive nuisance" is also merely a circumstance bearing on the same question'; and again, quoting from Prosser on Torts, 1941, p. 619: ' "The better authorities now agree that the element of 'attraction' is important only in so far as it may mean that the trespass is to be anticipated, and that the basis of liability is merely the foreseeability of harm to the child" '; and again: 'nor is it important for what purpose a person (impliedly invited) enters premises on which a dangerous condition is maintained, provided his presence there is reasonably anticipated. Nor is it important, for the same reason, whether the dangerous condition is visible from traveled ways.' "

We will first discuss the evidence, or at least some of it, regarding condition (a) supra.

Since the attractiveness of a pond to children has a bearing on whether it should be anticipated that children would be in its vicinity, we insert a picture of the pond in which Larry drowned.

There is evidence that more water was in the pond on March 25, 1963, than is shown by this picture which was taken at a later date.

The evidence shows that this pond was a half to three-quarters of a mile from the nearest residence. It could not be seen from such residence; in fact, it could not be seen by a person on foot at a distance of more than 50 or 75 yards.

The pond was easily accessible by car and by foot; there being a trail leading to it. There was a fence on one side of the pond, but children nine or ten years of age had little trouble in getting through it. Some times the older children would help the smaller ones through the fence.

We quote from the testimony of Tony Hatch, who was ten years of age at the time of trial:

"Q About how many times had you been to this water hole before Larry drowned?

A About twenty times.

Q Have you ever fallen in this hole?

A Yes.

Q How many times have you fallen in?

A Around five.

Q About five times?

A Yes.

Q Did you see any other kids fall in this water hole?

A Yes.

Q About how many kids have you seen fall in that water hole?

A Around ten.

Q How many kids in the neighborhood were going down to this water hole before Larry drowned?

A I don't know. A lot of them.

Q You say a lot of them had?

A Yes.

Q How many would be there on a given time when you went down there; usually several people or kids were with you?

A Yes, usually around seven.

Q Usually about seven down there?

A Yes.

Q What did you do at that water hole?

A We would fish in it and throw rocks in it and different junk.

Q What else, if you can think of anything else that you did?

A We made rafts and floated them and we made boats, little toy ones that floated.

Q You fished and you made rafts and you made boats?

A Yes.

Q Did you do anything else?

A No. We went swimming sometimes.

\* \* \* \* \* \*

Q What were the ages of the children that were going down there?

A Sixteen, some of them, and some of them were six.

Q You say from six to sixteen then were the ages of them?

A Yes."

Michael Steven Lackey, age 10 testified:

"Q Had you ever been to this place before Larry drowned?

A Yes sir.

Q About how many times do you think you had been there?

A About three.

Q How long had you known about this water hole?

A About a month.

Q When you went down there did you go with some other boys?

A Yes sir.

Q About how many of you would go down there at a time?

A Two.

Q You and one other or two others?

A Two others.

Q Do you recall who they were?

A Craig Draper and Tony Hatch.

Q Mike when you were down there did you ever see anybody fall in that swimming pool?

A No sir.

Q Did you ever fall in it?

A Yes sir.

Q How many times did you fall in it?

A Once.

Q Can you swim?

A Yes sir.

Q Did you swim out all right?

A Yes sir.

Q Did you have your clothes on when you went in?

A Yes sir.

Q Now were there any other boys down there when you and Tony and Craig went down there—were there any other boys there when you got there?

A No sir.

Q Did any others come while you were there?

A No sir.

Q Just the three of you there at those times?

A Yes sir.

Q Who told you about it, do you know?

A A boy down the street from us named Mike Buss.

Q How long had he known about it, do you know?

A No sir.

Q Mike did you have any trouble getting to the water hole?

A No sir.

Q There was not any fence there that gave any problem to you?

A There was a fence, but we took another way. There was a road that led to the pond.

Q Can you tell us how you got there?

A I live on Briarwood and I went down Steck Avenue and there is a creek that we went—we walked down the dirt road to the pond and at the dirt road you kind of go up a hill and then you go down the hill and you are at the pond.

Q Did you have to go through any fence that way?

A No sir.

Q Do you know if most of the kids in the neighborhood knew about this water hole?

A Most everybody in the neighborhood did.

Q Did the parents all know about it too?

A No sir.

Q   Is it a pretty deep water hole?

A   Yes sir."

One of appellants testified:

"Q   You and other boys did gather around water holes at times I presume?

A   Oh yes, I was fairly normal."

This witness also testified that although he had been to the pool he could not tell how deep it was. There is evidence that at the rock ledge shown in the above picture the pond is at least ten feet deep.

The owners of the property on which the pond was located were aware of its existence. There is no evidence that any warning signs were posted or that any protective measures were taken by them with respect to the pond except that there was a fence as above noted.

We believe this feature of the case is controlled by the opinion in Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843, 8 A.L.R.2d 1231. There a pit containing water was located about 200 yards from a residence and the general surroundings of the pit were described as follows:

"One could 'get to it (the pool) without any trouble'; about the pit 'there was quite a bit of * * * vegetation, and quite a bit of grass'; that there was a truck 'road or trail' out there; people went 'back in there to have picnics'; it was 'open' there, 'all except some small bushes and grass'; about 'the scene of this pit' there were 'small bushes, where the trucks ran over them and beat them down'; there were 'no trees' right at the hole or 'around it'; in the 'spring and summer' there would be 'wild flowers and things like that growing there.' Defendant himself testified that the pool was accessible to those located where plaintiff was 'if they wanted to wade through grass and weeds and brush.'

The waterhole itself is designated on the plat. The bank 'down to the water * * * was straight off, then it had a sharp incline to the bottom'; the bank 'was pretty slanting, and whenever I stepped off in there I slid on to the bottom; it (the water) came up to my chin'; the water was 'well over the head of a child five or six years old'; when I (one of the searchers for the child) 'got there it (the pool) was full of water'; were no outlets to it, however; 'the banks were a straight off drop.' "

The Court, under these facts, held that a jury finding that the owner of the property knew or should have known that children of tender years played about or swam in the pit, was sustained by evidence.

About the only factual differences between Banker, a drowning case, and this case is, there the distance from a residence to the pool was 200 yards, whereas, here it is at least 900 yards, and there the pit was not shallower than 5 feet to 8 feet, whereas, here the pond was shallow at one end.

We believe these are both evidentiary matters and that they require no conclusive finding. As to distance, it is "accessibility" which is really important. The fact that one end of the pond was shallow is of relative unimportance. An eight year old boy does not drown in water of wading depth unless there are other contributing factors.

We believe that fulfillment of requirement (b) above is patent under the decision in Bankers. There it was said, in referring to the pit which has been described in the quoted excerpt from that case, "That it was dangerous to children is not open to question under the record." Any time children of tender years who cannot swim play, unattended by adults, near an unguarded pond which is beyond their depth, they engage in an extremely dangerous pastime.

Condition (c), above, relates to the age of the child and its appreciation of the

danger in playing around the pond. The child who drowned in Banker was five years and ten months, and the Court sustained a finding that because of its tender age it did not realize the risk involved in going into the pool. In Massie v. Copeland, 149 Tex. 319, 233 S.W.2d 449, a drowning case, the Court held, as a matter of law, that a boy fourteen years of age who was normal, healthy and robust was capable of understanding and appreciating the dangers in swimming in the muddy waters of the pit. The Court there quoted the following from Vol. 65, Negligence, p. 469, § 29 (11), C.J.S.:

> " 'While there is no definite age fixed at which a child ceases to be entitled to the protection of the attractive nuisance doctrine, the great majority of cases in which it has been applied have involved children of less than ten years of age, and it has been considered that it cannot be applied to a child of the age of fourteen or over, at least in the absence of some showing of a lack of the mental development, which, is ordinarily found in children of that age or of a very exceptional state of facts.' "

In Larnel Builders, Inc. v. Martin, 105 So.2d 580, Fla.Dist.Ct. of App., 3rd Dist., the attractive nuisance doctrine was applied in behalf of the father of a seven year old boy who slipped or fell into a pool of water and drowned.

The evidence is that Larry was an obedient son. He helped about the house. He was ambitious. "He was not athletically inspired but he liked to play the sports as best he could." In school, he made a little above average grades.

■ It is our opinion that under the law as we understand it and the facts of this case it cannot be said, as a legal conclusion, that Larry Robertson, aged 8 years and 1 month, was capable of realizing and appreciating the dangers and risks involved in playing about the pond located on appellees' property.

■ We are also of the opinion that a question of fact exists regarding requirement (d) above.

The only utility which this pond has or has had to appellees is furnishing water for stock.

In 1953 the individual appellees purchased a 254-acre tract of land in northwest Austin, Travis County, for resale at a profit. The pond in suit was located on this tract. Later the corporate appellee acquired 54 acres of the larger tract, the pond being on the land so acquired.

One of the original purchasers, Mr. Ernest W. Jackson, testified that he was a part owner of Steck Company when Steck Company moved to Steck Avenue. The pond is about one-half mile from Steck Avenue.

We quote from Mr. Jackson's testimony:

"A In answer to your question, we had no intention of doing the subdividing ourselves. We were going to hold it until somebody might come along who wanted to subdivide it. We had no intentions of going into the subdivision business.

Q You bought it as a holding group with the intent to hold it until prices went up?

A Hoping to realize a profit, yes.

Q Did you anticipate that the town would grow into that area?

A Oh we did not know, back in 1952. We realized when we put a plant out there that it probably would get more valuable. We had no idea of what might happen though.

Q You were aware in 1962 that the town was developing and growing into that area were you not?

A Oh yes.

\* \* \* \* \* \*

Q Other than holding this property and waiting for it to go up in value so you could sell the land or part thereof, did you put this land to any use?

A Well we did rent it to two or three different people for grazing. I believe a person named McNeil rented it awhile to graze some horses. They were running a riding stable. They rented it because we had water on it. I believe we rented it three different times because we were told there was a tank up there. That is all the information we had on it, that there was a tank up there and we could rent it and it would be good grazing property and we rented it out for grazing I believe three different times.

Q When was the last time it had been rented for grazing purposes?

A I believe I have that information here, just a moment. I believe the year of 1960 was the last time it was rented for grazing. We were on the point of renting it again in 1961 but the man who was going to rent it decided not to and I believe 1960 was the last year we used it for grazing.

\* \* \* \* \* \*

A \* \* \* On the two occasions we rented it the renters said they needed some fence to hold the stock. They wanted to run the fence wire up to take in that stock underpass under the railroad and go across to the west side of the railroad and they agreed to put the fence across there and run it across to take in the water hole so they would have water and there was about sixty acres there, and so they did put in a fence at their own expense to keep their stock on that side. That was a provision in the lease."

The annual rental was $5.00 per acre for 63 acres.

We quote from the testimony of appellant regarding the nature of the pond:

"Q What did you find that indicated to you that it was a man-made water hole?

A It is very similar to a stock tank in the rural areas. I have seen a number of these. Some type of machinery has built a wall in a U shape to catch the watershed and rains as they come along during the years and I feel sure in view of the type of terrain it was a man-made object.

\* \* \* \* \* \*

Q Mr. Robertson you testified that in your opinion the water hole we have been testifying about is a man-made water hole. Specifically I would like to ask you in your opinion is this pond artificial or natural?

A I would say artificial.

Q In your opinion is the water supplied naturally or artificially?

A I don't know whether it is—I would say the rain would be the main producer of the water."

Appellee, Mr. Jackson, testified, when asked if there was any practical way to eliminate the water hole, "Well I guess you could do it if you put several hundred carloads of dirt in there but you would have a spring. You would have a mudhole."

Appellees' surveyor witness, Mr. Claude F. Bush, Jr., testified:

"Q Now Mr. Bush in making that survey and going upon the ground out there you have observed the water hole have you not?

A Yes sir.

Q Have you ever found it to be dry?

A Well I have never seen it completely dry. I mean I have seen it two or three times on different occasions surveying out there.

Q Has it always had water out there?

A It had some water in it.

Q Now is it fed by springs or what causes the water out there?

A I don't know just exactly what the source of the water or how it gets there exactly.

* * * * * *

Q Mr. Bush you measured from a mound of dirt up there. What was that mound of dirt?

A It was the top of the levee around the tank.

Q Was it a dirt dam?

A A dirt dam, yes sir.

Q Obviously pushed up there with a bulldozer or something for the purpose of catching water?

A Yes sir."

We believe that the jury was entitled to draw an inference that if a bulldozer had pushed up dirt to make the pond, a bulldozer could push it away and thus easily destroy the pond.

This evidence is sufficient, in our opinion, to present an issue of fact regarding the utility of the pond as compared with the danger of maintaining it.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.